### DEXTER *v.* HALL.

1. The power of attorney of a lunatic, or of one *non compos mentis*, is void.
2. When evidence has been given tending to show the insanity of a grantor, and other evidence tending to show his sanity, a medical expert cannot be asked his opinion respecting that person's sanity or insanity, forming his opinion from the facts and symptoms detailed in the evidence.
3. Such a witness may be asked his opinion upon a case hypothetically stated, or upon a case where the facts are certain and found ; but he will not be allowed to determine from the evidence what the facts are, and to give his opinion upon them.
4. Under the California statutes of limitations, a plaintiff in ejectment who has established a legal title in himself, is presumed to have had actual possession of the land within five years next prior to the commencement of his suit, unless an actual adverse possession by another is affirmatively proved.

ERROR to the Circuit Court for the District of California, in which court Mary Hall and her four children brought ejectment against Henry Dexter; both parties claiming under John Hall, who died intestate; the plaintiffs as his widow and children; the defendant as his grantee. The case was thus:

On the 30th of December, 1848, T. W. Leavenworth, then alcalde of San Francisco, granted to Hall, a lieutenant of our navy who happened to be in service off San Francisco, a piece of land, part of the pueblo lands situate within the corporate limits of the city as defined in 1851, east of Larkin and north of Johnson Street. The deed was duly recorded before April

3d, 1850, in a proper book deposited in the office of the recorder of the county of San Francisco.

Hall afterwards was sent to a lunatic asylum near Philadelphia. While there he executed, on the 27th of December, 1852, a power of attorney to one Harris, his brother-in-law, to sell this land. The power was acknowledged in the usual form before one Broadhead, a commissioner for California, resident in Philadelphia, who went to the asylum, saw Hall, read the power of attorney to him, asked him if he understood it, which he said he did, and that he desired the land sold for the benefit of his wife and children. Under this power the land was conveyed to persons, who afterwards conveyed to Dexter, the defendant.

· Subsequently to the grant made by the Alcalde Leavenworth to Hall, the claim of San Francisco to her pueblo lands was submitted to the United States Board of Land Commissioners, and on the 3d of October, 1854, confirmed. An appeal was taken to the District Court, and thence transferred to the Circuit Court, where, on the 18th of May, 1865, the claim of the city to the lands, including the lot now in controversy, was confirmed. And this decree of the Circuit Court was affirmed by this court, the mandate having been sent down and filed February 4th, 1867. On the 20th of June, 1855, a city ordinance, known as the Van Ness ordinance, was passed, by which the city relinquished and granted all her right and claim to the lands within her corporate limits, as defined by the charter of 1851, to the parties in actual possession thereof, by themselves or tenants, on or before January 1st, 1855, provided such possession was kept up until the introduction of the ordinance into the common councils, or, if interrupted by an intruder, had been, or might be recovered by legal process. The ordinance also declared that all persons who held title to lands within said charter limits, lying east of Larkin Street, and northeast of Johnson Street, by virtue of any grant by any ayuntamiento, town council, or alcalde of the pueblo after the 7th of July, 1846, and before the incorporation of the city, which grant, or a material portion of which, was recorded in a proper book of

records, deposited in the office of the recorder of the county of San Francisco on or before April 3d, 1850, should, for all purposes contemplated by the ordinance, be decreed to be the possessors of the land granted, although it might be in the actual occupancy of persons holding the same adverse to the grantees. As the lot granted to Hall was within this description, the ordinance assured to him whatever right and title the city then had, and confirmed, so far as the city could confirm it, the alcalde's grant.

Subsequently, on the 11th of March, 1858, the legislature of the State passed an act ratifying and confirming what the city councils had done by the Van Ness ordinance, and on the 1st of July, 1864, Congress enacted that all the right and title of the United States to the lands within the corporate limits of the city of San Francisco, as defined in the act incorporating the city, passed by the legislature of California April 15th, 1851, were thereby relinquished and granted to the city for the uses and purposes specified in the ordinance thereof, ratified by an act of the legislature of the State, approved on the 11th of March, 1858, excepting, however, from the relinquishment certain parcels not included in the grant to Hall.

Hall died in 1860 in the asylum, leaving his widow already mentioned, and four children; all minors at that time, the eldest being twenty years old, the next seventeen, the next fifteen, and the youngest nine.

In 1866 Mrs. Hall and these children (the youngest not yet being of age, and suing by a guardian), brought the ejectment mentioned as this suit.

At the time of the suit there were certain acts of California in force, as follows:

1st. An act of April 22d, 1850,* " defining the time for commencing civil actions." The 9th section of this act read thus:

"In every action for the recovery of real property or the possession thereof, the person establishing a legal title to the

---

* Statutes of California, A.D. 1850, p. 343.

premises shall be presumed to have been possessed thereof within the time prescribed by law, and the occupation of such premises by any other person shall be deemed to have been under and in subordination to the legal title, unless it appear that such premises have been held and possessed adversely to such legal title, for five years before the commencement of such action."

2d. An act of March 5th, 1864,* "to limit the time for the commencement of civil actions in certain cases." This act read as follows:

"In any action which shall be commenced, more than one year after this act takes effect, for the recovery of real property situated in the city and county of San Francisco, or for the recovery of the possession thereof, none of the provisions of the act entitled, &c., passed March 11th, 1858 [the act already referred to,† as of that date.—REP.], and none of the provisions of either of the orders or ordinances therein recited or referred to, shall be deemed to give, confirm, or otherwise aid the right or title set up or claimed by any party, unless such party, his ancestor, predecessor, or grantor shall have had actual possession of the land in dispute within five years next before the commencement of such action, the time already elapsed when this act takes effect to be included in the computation."

In this act there was no provision saving the rights of minors or persons otherwise under disabilities. However, an act passed April 4th, 1864,‡ supplementary to the original act, did make an exception in favor of such persons, including persons "within the age of majority," and enacted that "the time during which such inability shall have continued shall not be deemed any portion of the period of limitation, established in the said act, to which this is supplementary."

Intermediate between these acts was a third one, that of April 11th, 1855,§ to amend an act entitled "An act defin-

---

* Statutes of California, A.D. 1863–4, p. 149.

† *Supra,* p. 11.

‡ Statutes of California, A.D. 1863–4, p. 435.

§ Id., A.D. 1855, p. 109.

ing the time for commencing civil actions," passed April 22d, 1850.   This intermediate act provided that

"No action for the recovery of real property, or for the recovery of the possession thereof, shall be maintained unless it appear that the plaintiff, his ancestor, or grantor, was seized or possessed of the premises in question, within five years before the commencement of such action; provided, however, that an action may be maintained by a party claiming such real estate, or the possession thereof, under title derived from the Spanish or Mexican governments, or the authorities thereof, if such action be commenced within five years after final confirmation of such title by the United States or its legally constituted authorities."

The plaintiffs having shown Hall's paper title, including the Van Ness ordinance, and the statutes of California, and of the United States in aid thereof, having shown also the death of Hall, and their own heirship under the laws of California, rested.

The defendant then requested the court to charge the jury that upon these facts he was entitled to a verdict upon the following grounds:

" That the plaintiffs relied on the grant from Leavenworth, alcalde, upon the Van Ness ordinance, and the laws of California, and of the United States in aid thereof.   That having commenced their action more than one year after the act of California, approved March 5th, 1864, and entitled 'An act to limit the time for the commencement of civil actions in certain cases,' took effect, they must show an actual possession of the premises in themselves or their ancestors, within five years next before the commencement of this action, which they had failed to do."

The court, however, refused so to charge, and the case, under exception to the refusal, proceeded.

In this further progress of it, certain depositions of persons resident at Philadelphia (in an asylum near which city it will be remembered that Hall had been confined), were read; some tending to show that on the 27th December, 1857 (the date of execution of the power of attorney under

which the land had been sold to the defendants or his grantors), Hall was sane, and others tending to show that he was insane. All these depositions being read the defendants called Dr. Elliot, a physician of San Francisco, who had been long in practice, and was still in practice, and asked him this question (he having read carefully *all* the testimony in the case relating to Hall's sanity and insanity):

"From the facts stated in these depositions and the symptoms stated, what, in your opinion, was the state of Hall's mind December 27th, 1852, as to sanity or insanity?"

The plaintiffs objected to the witness expressing any opinion founded on the testimony adduced on *both* sides, and the court sustained the objection; permitting the witness, however, to give his opinion upon the testimony adduced by the plaintiffs. The witness then stated, under the defendant's exception to the ruling, that in his opinion as a medical man of large experience, from the facts and symptoms detailed by the *plaintiffs'* witnesses, Hall was capable of doing business, and of executing a power of attorney before, at, and after December 27th, 1852, and that such a case of insanity as his appeared to have been, rarely occurred without lucid intervals.

The defendant in rebuttal offered to prove that he had purchased the premises in good faith, for a full consideration, and without notice of the alleged insanity of Hall. But the court rejected the testimony.

The great questions in the case were:

1st. Of fact. Whether Hall was sane or insane, when he executed the power of attorney.

2d. Of law. If he was insane, whether the instrument was void or voidable only.

On this last point the court below, having stated that the presumption of law, generally speaking, was in favor of sanity, and that whoever set up insanity was bound to prove it, said:

"If, at the time Hall executed the power in question, he was insane, and his insanity was general, *the instrument was a nullity,*

*and no title could be transferred under it. In that case the plaintiffs are entitled to a verdict. It matters not, if such were the case, what consideration may have been paid to the attorney, or with what good faith the parties may have purchased. The instrument, in such case, is no more to be regarded as the act of Hall than if he was dead at the time of its execution."*

The jury found for the plaintiffs; thus finding that Hall was insane.

The case was now here on error, the charge, as just mentioned, as to the effect of insanity, if found, on the power of attorney, being the great question in the case; assignments of error being also made in regard to the question which the court allowed to be put to Dr. Elliot, the medical expert, and to other matters of evidence, and to the refusal of the court to direct the jury when the plaintiffs first rested, that the verdict should be for the defendants.

The case, on the great point of it—the effect of an insanity, which, after the verdict of the jury, was to be regarded, of course, as admitted—was interestingly argued, and with a close examination of the authorities.

*Mr. Roscoe Conkling, for the plaintiff in error, and Mr. P. G. Galpin, contra.*

*For the plaintiff in error*, reference was made to certain expressions in *Beverly's Case*, reported by Lord Coke,* but more especially to what is stated by Sir W. Blackstone in his Commentaries,† thus:

" Idiots and persons of non-sane memory . . . are not totally disabled either to convey or purchase, but *sub modo* only ; for their conveyances and purchases are voidable, but not actually void "

Thus the law, as laid down by the great teacher of elementary law, both in England and here, for more than a hundred years, showed (it was said), that, assuming Hall to have been insane when he executed the power, the power

---

. * 4 Reports, 123, *b.*                    † Vol. 2. p. 291.

may have been voidable, but was not void. Suppose (it was argued) that instead of a power, the instrument had been a contract for the sale of the land, acknowledged by Hall and wife, and that the contract had been assigned through Page to Dexter for value; the same objection would lie against it as against the power of attorney. But, the consideration being adequate, and the transaction being free from fraud and without notice, a court of equity would enforce it against both. This is the law as it is to be gathered from *Jackson* v. *Gumaer*,* and *Ingraham* v. *Baldwin*,† with other cases, in New York; from *Somers* v. *Pumphrey*,‡ *Crouse* v. *Holman*,§ in Indiana; *Chew* v. *Bank of Baltimore*,‖ in Maryland, and from decisions elsewhere in the United States.¶

Then, there are certain facts which should be remembered.

1. There was no proof that Hall and Dexter or Hall and Page ever met, or that Page or Dexter knew of or suspected the insanity of Hall, nor is there any evidence of unfairness, fraud, or inadequacy of price. In that case the transaction stands.**

2. The attorney of Hall was his brother-in-law. No motive is shown for any fraud or deception by him or by those who acted in obtaining the power. They were his relatives and friends.

3. So far as appeared, Hall had not been placed under a committee, nor had he been pronounced insane by judicial decision, and if that had not been done, his contracts are valid, no undue advantage having been taken of him in obtaining them.††

4. No complaint was made that the consideration was in-

---

* 2 Cowen, 552.       † 12 Barbour, 9; S. C., 9 New York, 45.

‡ 24 Indiana, 231.       § 19 Id. 30.       ‖ 14 Maryland, 299.

¶ Williston v. Williston, 41 Barbour, 635; Kerr v. Purdy, 50 Id. 25; Cuff v. Dorland, 50 Id. 438; Freeman v. Freeman, 51 Id. 306; Bruce v. Tilson, 25 New York, 194; Lobdell v. Lobdell, 36 Id. 327; Story v. Conger, 36 Id. 673.

** Yauger v. Skinner, 1 McCarter, 389.

†† Sims v. McLure, 8 Richardson's Equity, 286; Hovey v. Chase, 52 Maine, 304; Parker v. Davis, 8 Jones's Law (N. C.), 460.

adequate, or that it was not fully paid by the purchaser. And there was no allegation of fraud in obtaining the power, or in executing the grant.

[The other points of the case were also argued, but being comparatively unimportant, the argument, in the reporter's limited space, is not presented.]

*For the defendant in error.*—Some confusion exists, perhaps, at this day in the American decisions as to the effect of a deed of a bargain and sale made by a person *non compos mentis.* So far as it does exist, it has arisen from a passage in Blackstone's Commentaries, quoted on the other side; one of the very few errors to be found in that excellent book; but an error, certainly, nevertheless. The statement of the law made by Sir W. Blackstone, in the passage quoted, cannot be reconciled with what is affirmed in *Thompson* v. *Leach,* a solemn adjudication, made before his time, but of binding authority in it; reported alike by Salkeld, Carthew, and Comberback.\* That precedent was followed, before Blackstone's time, by *Yates* v. *Boen,* reported by Sir John Strange,† a reporter of high character; and the statement of the great English commentator was not a true presentation of the law even in his day. His error has been pointed out in our own time, by Sir Edward Sugden, in his most accurate and masterly work on Powers;‡ and though some American judges, as we have said, have been confused (as was not unnatural in view of the great and generally just respect paid to anything in the Commentaries of Blackstone), we find that when the point was raised in the Supreme Court of Pennsylvania,§ Chief Justice GIBSON, one of the vigorous judicial minds of America, took the distinction at once between a feoffment and a deed of bargain and sale; holding the latter absolutely void. He said:

"The authorities show distinctly that the feoffment and livery of a lunatic or madman are not void, but voidable. . . .

---

\* 3 Salkeld, 300; Carthew, 435; Comberback, 469.

† Vol. 2, 1104.                  ‡ Vol. 1, 179.

§ Estate of Sarah De Silver, 5 Rawle, 111.

So far the argument made for the defendant in error seems unassailable. The defect in it is that it fails to prove the deed of bargain and sale, by which he holds, to be equivalent in *all* respects to a feoffment. . . . At common law the feoffment of a madman, as shown by the argument, is only voidable. But his deed is absolutely void."

But though Sir William misconceived the law as to the ability of a person who made a deed while in a state of lunacy, *himself* to set it aside, upon the recovery of his reason, he did not at all misconceive it, so far as related to the person's heirs or other persons interested after his death. For after stating that the *old* law had been that the lunatic, on recovery of his reason, might set up his former lunacy to avoid his acts, but that this, as respected the lunatic's ability himself to avoid his acts, had been apparently changed by later views (though not, as he intimates, upon very sensible reasons), he adds:

"And clearly the next heir or other person interested may, after the death of the idiot or *non compos,* take advantage of his incapacity and avoid the grant."

Our case is exactly this one, where Sir William says that the lunatic's grant *may* be avoided.

*Again.*—If Blackstone's statement of the law were true, there is a distinction to be drawn between a deed and a power of attorney. The latter will be void when the former is not. Thus the deeds of infants are not void, but voidable. If the infant do not dissent within a reasonable time after coming of age the deed cannot be avoided. A warrant of attorney has, however, always been held absolutely void.[*] The reason is stated in the first volume of the American Leading Cases.[†]

As to the authorities cited on the other side, while we contend that the deed of a lunatic is absolutely void, we also admit that the privilege of asserting that it is void, is, like

[*] Thompson *v.* Leach, 3 Modern, 302; Zouch *v.* Parsons, 3 Burrow, 1804; Pyle *v.* Cravens, 4 Littell, 17; Lawrence *v.* McArter, 10 Ohio, 37.

[†] Page 254.

infancy, a personal privilege, and can only be enjoyed by the lunatic and those who claim under him. This distinction alone is sufficient to have decided the cases of *Jackson* v. *Gumaer* and of *Ingraham* v. *Baldwin.*

*Chew* v. *Bank of Baltimore* was a case of a bill filed in equity to set aside the power of attorney of a lunatic, and to declare certain sales of bank stock made under it fraudulent and void, and this case certainly shows that if we had brought an action in equity we might have succeeded.* Here, as there, it is not shown that the heirs ever received any portion of the money arising from the sale.

*Somers* v. *Pumphrey*, in Indiana, is decided on the case of *Crouse* v. *Holman*, in the same State, and the latter evidently stands on the mistake of Blackstone, corrected by Sugden, as before shown.

The remaining cases cited are cases where a court of equity has decreed the specific performance of contracts notwithstanding great lapse of time. We do not dispute the law contained in them.

It is argued that prior to the issuing of a commission *de lunatico*, the acts of a lunatic are binding upon him, though it seems to be conceded that after that they are not. But the commission has no effect to render the madman more mad than he was before. It is his insanity that renders the act void. The commission may be *primâ facie* evidence of madness, sufficient to put one dealing with a lunatic upon his guard, and it might well be held that a commission issued was notice to all the world, and thereafter every act of a lunatic was void. But confinement within the walls of a madhouse, and chains, and uncontrollable frenzy, are notices equally clear and equally conclusive to every one doing business with such a lunatic, and shall he be bound by his acts because he has not the sanity required to procure the issuing of the commission?

If a man has no reason, there can be no " assent of two or more minds," which is essential to every contract. The

---

* See the remarks on pp. 318 and 319.

act performed by a person having no reason is absolutely void. It may not be apparent that the act was void until the lunacy is proved, but when it is proved to have existed when the act was done, then the act was void *ab initio.*

This observation, it may be added, if true, disposes of the suggestion, made below as here, that we should have proceeded in equity.

[The other assignments of error were then discussed in behalf of the defendant in error.]

Mr. Justice STRONG delivered the opinion of the court.

The prominent question in this case is, whether a power of attorney executed by a lunatic is void, or whether it is only voidable. The Circuit Court instructed the jury that a lunatic, or insane person, being of unsound mind, was incapable of executing a contract, deed, power of attorney, or other instrument requiring volition and understanding, and that a power of attorney executed by an insane person, or one of unsound mind, was absolutely void. To this instruction the defendant below excepted, and he has now assigned it for error.

Looking at the subject in the light of reason, it is difficult to perceive how one incapable of understanding, and of acting in the ordinary affairs of life, can make an instrument the efficacy of which consists in the fact that it expresses his intention, or, more properly, his mental conclusions. The fundamental idea of a contract is that it requires the assent of two minds. But a lunatic, or a person *non compos mentis,* has nothing which the law recognizes as a mind, and it would seem, therefore, upon principle, that he cannot make a contract which may have any efficacy as such. He is not amenable to the criminal laws, because he is incapable of discriminating between that which is right and that which is wrong. The government does not hold him responsible for acts injurious to itself. Why, then, should one who has obtained from him that which purports to be a contract be permitted to hold him bound by its provisions, even until he

may choose to avoid it? If this may be, efficacy is given to a form to which there has been no mental assent. A contract is made without any agreement of minds. And as it plainly requires the possession and exercise of reason quite as much to avoid a contract as to make it, the contract of a person without mind has the same effect as it would have had he been in full possession of ordinary understanding. While he continues insane he cannot avoid it; and if, therefore, it is operative until avoided, the law affords a lunatic no protection against himself. Yet a lunatic, equally with an infant, is confessedly under the protection of courts of law as well as courts of equity. The contracts of the latter, it is true, are generally held to be only voidable (his power of attorney being an exception). Unlike a lunatic, he is not destitute of reason. He has mind, but it is immature, insufficient to justify his assuming a binding obligation. And he may deny or avoid his contract at any time, either during his minority or after he comes of age. This is for him a sufficient protection. But as a lunatic cannot avoid a contract, for want of mental capacity, he has no protection if his contract is only voidable.

It must be admitted, however, that there are decisions which have treated deeds and conveyances of idiots and lunatics as merely voidable, and not void. In *Beverly's Case,** which was a bill for relief against a bond made by Snow, a lunatic, it was resolved that every deed, feoffment, or grant, which any man *non compos mentis* makes, is avoidable, and yet shall not be avoided by himself, because it is a maxim of law that no man of full age shall be, in any plea to be pleaded by him, received by the law to stultify himself and disable his own person. A second reason given for the rule was, " because when he recovers his memory he cannot know what he did when he was *non compos mentis.*" Neither of these reasons are now accepted, and the maxim no longer exists. There were other things ruled in Beverly's case, among which were these: that the disability of a lunatic is

---

* 4 Reports, 123, *b.*

personal, extending only to the party himself, except that it extends to privies in tenure, as lord by escheat, and privies in estate, as tenant in tail; but that privies in blood, as heirs, or privies in representation, as executors or administrators, might show the disability of the ancestor, or testator, or intestate. It was also resolved that acts done in a court of record were not avoidable even in equity. Lord Coke, in commenting on the case, remarked that " as to others there is a great difference between an estate made in person and by attorney; for if an idiot, or *non compos mentis*, makes a feoffment in fee in person, and dies, his heir within age, he shall not be in ward, or if he dies without heir the land shall not escheat; . . . but if the feoffment is made by letter of attorney, although the feoffor shall never avoid it, yet after his death, as to all others, in judgment of law, the estate is void, and therefore in such case, if his heir is within age, he shall be in ward; or, if he dies without heir, the land shall escheat." Such also is the rule as stated in Fitz Herbert's *Natura Brevium*.* This is plainly a recognition of the principle that the letter of attorney of an idiot or lunatic is void, though he may not be permitted himself to assert its nullity. His heir, and all others, may. The doctrine is also asserted that as against the heirs of a lunatic his deed is invalid, and this, we think, has been steadily maintained in England.

In *Thompson* v. *Leach*, reported in Carthew,† and in Comberbach,‡ a clear distinction was taken between the feoffment of a lunatic taking effect by livery of seizin, and his deed of bargain and sale, his surrender, or grant. The former was held to be voidable only because of the solemnity of the livery, while the latter were held to be void. The case was ejectment brought by a lunatic's heirs, and the controlling question was whether his deed was only voidable, or whether it was absolutely void. The grantor had a life estate upon which were dependent contingent remainders, and he made a deed of surrender. If his deed was at any time effective before the contingency happened, it merged

* 202, c.                 † Page 435.                 ‡ Page 469.

the tenancy for life, and destroyed the contingent remainders, and though the deed might afterwards be avoided by any means in law, yet the contingent remainders, being once extinct, could not be revived by any matter *ex post facto.* It was necessary, therefore, to determine whether the deed was a nullity or whether it was good until avoided. The court resolved that the deed was void, *ab initio*, because of the grantor's lunacy. It was said that "there is a difference between a feoffment and livery made *propriis manibus* of an infant, and the bare execution of a deed by sealing and delivery thereof, as in cases of grants, surrenders, releases, &c., which have their strength only by executing them, and in which the formality of livery of seizin is not so much regarded in the law, and, therefore, the feoffment is not void, but voidable; but surrenders, grants, &c., of an idiot are void *ab initio.*" The case is a leading one, and it is in some respects more fully reported in Salkeld.* There it appears not only that the distinction mentioned is recognized, but that Holt, C.J., declared the deed of a person *non compos mentis* to be void; that if he grants a rent, and the grantee distrains for arrears, he may bring trespass; that his letter of attorney, or his bond, are void, because, as he stated, the law had appointed no act to be done for avoiding them. *Thompson* v. *Leach* has never been disturbed, and, so far as we know, has never been doubted. It was followed by the case of *Yates* v. *Boen*, in Strange,† which was an action of debt upon articles. The defendant pleaded "*non est factum*," and offered to give lunacy in evidence. Upon the authority of *Thompson* v. *Leach*, and *Smith* v. *Carr*, decided in 1728, the evidence was received.

The doctrine of *Thompson* v. *Leach* was asserted also in *Ball* v. *Mannin*,‡ decided in the House of Lords in 1829. In that case the sole question presented was, by agreement of counsel, whether the deed of a person *non compos mentis* was *invalid at law.* In the inferior court the judge had charged the jury

---

* Vol. 3, page 300; see also 2 Ventris, 198.
† Vol. 2, p. 1104.                    ‡ 1 Dow & Clark, 380.

that "to constitute such unsoundness of mind as should avoid a deed *at law*, the person executing such deed must be incapable of understanding and acting in the ordinary affairs of life," and refused to charge that the unsoundness of mind must amount to idiocy. The ruling was sustained by the Court of King's Bench in Ireland, and, on writ of error, by the Exchequer Chamber. The case was then removed to the House of Lords, and the judgment was affirmed. It is, therefore, the settled law of England, and it has been since the decision in *Thompson* v. *Leach*, that while the feoffment of an idiot, or lunatic, is only voidable, his deed, and especially his power of attorney, are wholly void. And now by act of Parliament, 7th and 8th Vict., ch. 76, § 7, his conveyance by feoffment, or other assurance, is placed on the same footing with his release or grant.

Sir William Blackstone, it is true, appears to have overlooked the distinction made in *Thompson* v. *Leach;* and in his Commentaries,* while admitting that the law was otherwise prior to the reign of Henry VI, asserted the doctrine that the conveyances of idiots and persons of non sane memory, as well as of infants and persons under duress, are voidable, but not actually void. But Sir Edward Sugden† notices this statement with disapproval. His remarks are as follows: "When Beverly's case was decided it was holden that deeds executed by lunatics were voidable only, but not actually void, and therefore they could only be set aside by special pleading, and by the rule of law the party could not stultify himself. And Mr. Justice Blackstone, following the old rule, has laid down that deeds of lunatics are avoidable only, and not actually void. But in *Thompson* v. *Leach* the distinction was solemnly established that a feoffment with livery of seizin of a lunatic, because of the solemnity of the livery, was voidable only; but that a bargain and sale, or surrender, &c., was actually void. This, therefore, was the ground of the decision in *Yates* v. *Boen.* When the Chief

---

* Book 2, page 291.

† 1 Sugden on Powers, 179; see also Shelford on Lunatics, 257-8-9.

Justice remembered that an innocent conveyance, or a deed, by a lunatic, was merely void, he instantly said, that *non est factum* might be pleaded to it and the special matter be given in evidence."

In this country there has been inconsistency of decision. Some courts have followed Mr. Justice Blackstone, and *Beverly's Case*, without noticing the distinction made in *Leach* v. *Thompson*, *Yates* v. *Boen*, and other English cases. Such are the decisions cited from New York, beginning with *Jackson* v. *Gumaer*,* and those relied upon made in other States. Nowhere, however, is it held that the power of attorney of a lunatic, or any deed of his which delegates authority but conveys no interest, is not wholly void. And in Pennsylvania, in the *Estate of Sarah De Silver*,† it was directly ruled that a lunatic's deed of bargain and sale is absolutely null and void, and the distinction between his feoffment and his deed was recognized. So also in *Rogers* v. *Walker*,‡ which was an ejectment by a lunatic, it was held that a purchaser from her had no equity to be reimbursed his purchase-money, or the cost of improvements, and Chief Justice Gibson said: "Since the time of *Thompson* v. *Leach*,§ it has been held that a lunatic's conveyance executed by sealing and delivery only is absolutely void as to third parties, and why not void as to the grantor? It was said to be so for the very unphilosophical reason, that the law does not allow him to stultify himself,—an early absurdity of the common law, which was exploded with us by *Bensell* v. *Chancellor*."‖

The doctrine that a lunatic's power of attorney is void finds confirmation in the analogy there is between the situation and acts of infants and lunatics. Both such classes of persons are regarded as under the protection of the law. But, as already remarked, a lunatic needs more protection than a minor. The latter is presumed to lack sufficient discretion. Reason is wanting in degree. With a lunatic it is wanting altogether. Yet it is universally held, as laid down by Lord Mansfield, in *Zouch* v. *Parsons*,¶ that deeds of an infant

---

* 2 Cowen, 552.     † 5 Rawle, 111.     ‡ 6 Pennsylvania State, 371.

§ Carthew, 435.     ‖ 5 Wharton, 371.     ¶ 3 Burrow, 1805.

which do not take effect by delivery of his hand (in which class he places a letter of attorney), are void. We are not aware that any different rule exists in England or in this country. It has repeatedly been determined that a power of attorney made by an infant is void.\* So it has been decided in Ohio,† in Kentucky,‡ in Massachusetts,§ and in New York.‖ In fact we know no case of authority in which the letter of attorney of either an infant or a lunatic has been held merely voidable.

It must, therefore, be concluded that the Circuit Court was not in error in instructing the jury that a power of attorney executed by an insane person, or one of unsound mind, is absolutely void.

This disposes of the only serious question in the case. There are other assignments of error, but they may be dismissed with brief notice. The only one which has any plausibility, and which needs particular notice, is that which complains of the refusal of the court to permit a medical witness to give his opinion respecting the sanity of John Hall at the time when he signed the power of attorney, basing his opinion upon the facts and symptoms stated in the depositions read at the trial. The witness was, however, allowed to give his opinion upon the testimony adduced by the plaintiffs. The record does not show fully what were the facts stated in the depositions, nor whether they were established by uncontradicted evidence. It may be, therefore, that, by the form in which the question was put, the witness was required not merely to give his opinion upon facts, but to ascertain and determine what the facts were. This of course was inadmissible. The rule is, as laid down in Greenleaf's Evidence,¶ "If the facts are doubtful and remain to be found by the jury, it has been held improper to ask an expert who has heard the evidence what is his opinion

---

\* Saunderson *v.* Marr, 1 Henry Blackstone, 75; 2 Lilly, Abridgment, 69; 1 American Leading Cases, 248–9.

† Lawrence *v.* McArter, 10 Ohio, 37.      ‡ Pyle *v.* Cravens, 4 Littell, 17.

§ Whitney *v.* Dutch, 14 Massachusetts, 462.

‖ Fonda *v.* Van Horne, 15 Wendell, 636.    ¶ § 440.

upon the case on trial; though he may be asked his opinion upon a similar case hypothetically stated."* The question asked was: "From the facts stated in these depositions, and the symptoms stated, what, in your opinion, was the state of John Hall's mind on December 27th, 1852, as to sanity or insanity?" It was to this the plaintiffs objected. But the witness gave his opinion, founded on all the testimony adduced by the plaintiffs tending to show insanity, and that opinion was that Hall was capable of doing business and of executing a power of attorney. He could have said no more had he been allowed to consider the evidence given by the defendants as well as that given by the plaintiffs. The defendants, therefore, received no possible injury from the ruling of the court. Hence this assignment cannot be sustained.

There remains one other exception to be considered, for the proper understanding of which reference must be made to the plaintiffs' title.†

That the grants and confirmations relied on by the plaintiffs were effectual to vest in Hall the title to the land in dispute admits of no question, and it is not denied by the plaintiff in error. He claimed under Hall. But when this title had been given in evidence by the plaintiffs below, with proof that they were the children and heirs of Hall, and when they had rested in chief, the defendants asked the court to direct a verdict in their favor for the reason, among others, that under the State statute of March 5th, 1864, it was incumbent upon the plaintiffs, inasmuch as their action had not been commenced within a year after its passage, to show an actual possession in themselves or their ancestors within five years next before the commencement of the action, which they had failed to do. The court refused the direction, and correctly. At the time when the request was made it did not appear that the actual possession of the land had

---

* Sills *v*. Brown, 9 Carrington & Payne, 601.

† See the statement of the title, *supra*, pp. 10, 11. The learned judge recapitulated it in nearly the same words as there given.

not been enjoyed by the plaintiffs within five years next before the action was brought, and, therefore, they were presumed to have had such possession, in the absence of evidence of an adverse possession, and no such evidence has been given. The 9th section of the act of April 22d, 1850, which defined the time for commencing civil actions, expressly declares that in every action for the recovery of real property such a presumption shall be made in favor of one establishing a legal title. In addition to this three of the plaintiffs were minors when the title descended to them, and continued minors until within less than five years before the suit was brought, and one was a minor until 1872. The period of their disability was, therefore, not to be included in the statutory period of limitation.

It is probable that when the request to direct a verdict for the defendants was made, the supplementary act of April 4th, 1864, was overlooked. Certainly it has not been argued here that the plaintiffs below were affected by the act of March 5th of that year. But it is claimed the plaintiffs were barred by the statute of limitations of 1855. That, however, is not before us. The Circuit Court was asked to give no instruction in regard to it, and none was given. Besides, so far as the record exhibits, there was no evidence of continued adverse possession during the five years next preceding the commencement of the suit.

There is nothing more in the case that requires particular notice; nothing which would justify our awarding a new trial.

JUDGMENT AFFIRMED.