PARKER v. MARCO et al.

(Circuit Court, D. South Carolina. October 30, 1896.)

1. CONTRACTS—INSANE PERSONS—CONTRACTUAL CAPACITY.
  In examining into contracts made by one whose mind is diseased, to determine his ability to do any particular act, the inquiry should be, what degree of mental capacity is essential to the proper execution of the act in question?

2. SAME—EXECUTION OF FORMER AGREEMENT.
  A person whose mind is diseased by drink, but whose business dealings are shown to be conducted with skill, ability, shrewdness, and memory, is not incapacitated to execute a mortgage of his property, in conformity with an agreement entered into when his sanity was unquestioned; and when he, at the time of signing the mortgage, declared his comprehension of the transaction, and impressed others with the fact that he understood what he was doing.

3. SAME—SEPARATE CONTRACT.
  If, however, at the execution of such mortgage, one attorney representing and advising both parties, the mortgagor is persuaded to allow, and does allow, such attorney to retain, for the benefit of the mortgagee, a part of other securities, which he is entitled to have restored to him, the transaction should be set aside.

4. SAME—GOOD FAITH—STATUS QUO.
  But such transaction should not be set aside, when the attorney's good faith is unimpeachable, unless the securities which were surrendered are returned, or their value replaced, thus putting both parties in statu quo.

This was a special inquiry directed by the court to determine the validity of a mortgage executed by Manuel Marco to Pelzer, Rodgers & Co., and resisted upon the ground that Marco was insane at the time of its execution.

Mordecai & Gadsden, P. A. Wilcox, and A. D. Cohen, for complainant.

Lord & Burke, Boyd & Brown, and W. F. Dargan, for defendants.

SIMONTON, Circuit Judge. This case comes up on a special inquiry directed by the court. Manuel Marco, a defendant in this case, was a merchant of Darlington county, S. C. He was a man of remarkable ability as a merchant, and from a humble beginning, by force of character and business talent, he had acquired a fortune. He had been doing his business with Charleston through James H. Parker the present complainant. For some reason he became dissatisfied with Parker, and desired to change his factor. To this end he sought the good offices of R. W. Boyd, Esq., a member of the bar in Darlington. Mr. Boyd introduced him to the firm of Pelzer, Rodgers & Co., of which firm the defendant F. J. Pelzer was the senior member. After some negotiation this firm

agreed to act as factors for Marco, and advanced to him an amount of money sufficient to relieve his entire obligations to Parker. This was towards the close of the year 1883. Thenceforth Marco became a customer of Pelzer, Rodgers & Co. Their mode of doing business was this: The firm made its advances to Marco as needed. To secure them he entered into bond in the penal sum of $100,000, and, as security to the bond, conveyed to them parcels of real estate in the county of Darlington; these conveyances, though absolute on their face, being only in fact mortgages. He also placed in their hands, as further collateral security, sundry bonds and mortgages of third parties to him. The business continued for some time. One of the conditions of business was that Marco should ship to them all the cotton he controlled, some 1,400 or 1,500 bales per annum, and in default he was to pay $1.50 per bale for each bale not shipped. After a time the course of business changed. Buyers of cotton, instead of confining their purchases to the cities and towns, went to the residences of the growers and holders of the cotton, and purchased directly from them, thus dispensing with the middlemen altogether. In this changed course of business, it became greatly to the disadvantage of Marco to continue to ship cotton to Pelzer, or else to pay the penalty of $1.50 a bale, not shipped. After negotiations the business was closed, and the amount due by Marco was ascertained. The accounts were first submitted to an expert accountant resident in Darlington, selected by him, and the result as reported by this accountant was accepted. It was agreed that the principal debt be reduced to $40,000, and this sum was to be secured by the realty already held by the firm, and by other security. Marco himself then proposed to Pelzer that the final settlement be made on this basis: Pelzer to release all claim for cotton not shipped (some $4,000), and to surrender the bonds and mortgages of realty held by him as collateral, and Marco to pay in cash enough to reduce the debt to $40,000, and to give as additional security a mortgage on his home place,—a valuable plantation, known as "Lydia." This was finally agreed upon. The date of the proposition and its acceptance was the spring of 1891. The relations between Mr. Pelzer and Mr. Marco were cordial. The confidence between them was mutual. Mr. Boyd, during the whole transaction, acted for both parties, and he was intrusted with the duty of carrying the final agreement into effect. When he was about to prepare the necessary mortgage, Marco, who evidently did not wish to incumber his home place, except as a matter of absolute necessity, informed Mr. Boyd that he had hopes of selling off some lands held by Pelzer as security, at a price which would largely reduce the debt, and asked indulgence to try this. This was granted, but the hopes of Marco were disappointed. Not discouraged by this failure, Marco made another effort, and sought, through a man named Carpenter, to borrow $50,000 on his lands from some building and loan association. This plan also failed. The efforts thus made by Marco consumed the years of 1891 and 1892. Mr. Boyd then pressed the conclusion of the original settlement. Finally a mortgage was executed

of the plantation Lydia in May, 1893: The validity of this mort-gage is the matter now in question. It is charged that Marco was demented at the time the mortgage was executed; that it was the act and deed of an insane person, and so null and void.

The question of law to which the facts of this case must be applied is a very simple one. Whatever may have been the ancient law on this subject, and however conflicting the decisions of the state courts may be upon the question whether the deed of an insane person be void or voidable, the law of this court is fixed and settled by the decision of the supreme court of the United States. The contract of a person, whether by deed or parol, who at the time of making it is bereft of reason, is absolutely void. The very essence of a contract is that there must be a concurrence of minds. There can be no concurrence, and therefore no contract, if one of the parties be without mind. This is the ratio decidendi in Dexter v. Hall, 15 Wall. 9:

"The fundamental idea of a contract is that it requires the assent of two minds. But a lunatic, or a person non compos mentis, has nothing which the law recognizes as a mind; and it would seem, therefore, on principle, that he cannot make a contract which may have efficiency as such." Id. 20.

The question before the court was whether the deed of an insane person was void or voidable. To that question the court directed its attention, and solved the doubts created by conflicting decisions in other jurisdictions, fixing the law in the federal courts. Mr. Justice Clifford, in the subsequent case of Johnson v. Harmon, 94 U. S. 371, amplifies this:

"Confirmed insanity, which deprives a person of mental capacity to distinguish between right and wrong in respect to the act in question, renders the person irresponsible for such an act, though criminal, and disqualifies him to enter into a contract, or to execute a valid instrument to convey real or personal estate. Both minds must meet in such a transaction, and if one is so weak, unsound, and diseased that a party is incapable of understanding the nature and quality of the act to be performed, or its consequences, he is incompetent to assent to the terms and conditions of the instrument, whether that state of his mind was produced by mental or physical disease, and whether it resulted from ordinary sickness, or from accident, or from debauchery, or from habitual and protracted intemperance."

But in avoiding contracts made by one, lunatic or insane, it must be inquired whether at the time the contract was made he was without contractual capacity. As is said in Lee v. Lee, 4 McCord, 194:

"It is not every man of a frantic appearance and behavior who is to be considered a lunatic, either as it regards obligations or crimes; but he must appear to the jury non compos mentis, not at an anterior period, but at the moment when the act was done."

The law is well stated by Field, J., in Hall v. Unger, Fed. Cas. No. 5,949, known in the supreme court as Dexter v. Hall, 15 Wall. 9:

"But, examining into contracts made by one whose mind is diseased, it does not follow from the fact that mania or dementia be shown that there may not be reason or capacity for business on some subjects. In determining the ability of the alleged insane person to execute any particular act, the inquiry should first be, what degree of mental capacity is essential to the proper execution of the act in question? and then whether such capacity was possessed

at the time by the party. It is evident that a very different degree of capacity is required for the execution of a complicated contract, and a single transaction of a simple character, like the purchase or sale of a lot."

The same general principle is found in Harrison v. Rowan, 3 Wash. C. C. 580, Fed. Cas. No. 6,141; The Parish Will Case, 25 N. Y. 9; Ball v. Mannin, 3 Bligh (N. R.) 1; M'Creight v. Aiken, Rice, 58.

The question of fact, therefore, in the case is: Was Marco, when he executed this mortgage to Pelzer,—at the time,—competent to make the contract? Did he understand what he was doing,—that he was executing a mortgage? Did he know what property the mortgage covered,—that it was his Lydia plantation? Did he know to whom it was mortgaged,—F. J. Pelzer? Did he know for what it was mortgaged,—his indebtedness to Pelzer's firm? A vast amount of testimony has been taken before the special master, and has been reported to the court. In its consideration the court has been assisted by arguments characterized by unusual ability, research, and learning. As has been said, Marco had remarkable ability as a merchant and business man. His habits, so far as the record discloses, were good until 1892. Up to that year he had his place of business at his plantation, Lydia; and from that place, for several years, he conducted a large business as a merchant, and very extensive planting operations. He removed to Darlington in the year 1892, and opened a large business house in that city. During 1892 and during 1893 he drank very heavily, and his debauchery in this respect had grave effect on his mental capacity. His powers became seriously impaired. His eccentricities of speech and manner became greatly exaggerated. His memory weakened. His business faculties dulled and sometimes suspended. On this subject there is a volume of testimony. Very many witnesses testify as to acts and conduct of Marco which are the acts and conduct of an insane man. Others—men of business capacity and of character—testify as to other acts, business transactions, which clearly show that at times, at least, his business capacity existed. He has never been adjudged a lunatic. Three physicians—one of them his family physician—declare that in their opinion he had become and was subject to dementia, a dement, from protracted and habitual intemperance. But, as has been seen, this does not conclude the matter. The question is, was Marco, at the date of the execution of this mortgage, without contractual capacity? Did he on that day have the ability to execute this particular act? Did he, could he, understand what he was doing,—that he was executing a mortgage. Did he, could he, understand that this mortgage covered his home plantation, Lydia. Did he, could he, know what the mortgage was to Mr. Pelzer, and for his debt to Pelzer's firm? In reaching a conclusion on this point, it is well to consider what degree of mental capacity was essential to the proper execution of the act in question, and then whether Marco possessed it at that time.

The act performed was the execution of a mortgage of the Lydia plantation. The causes inducing that act—the motive and purpose of it—had been proposed, discussed, determined upon, two years

before, when there was no doubt of the possession by Marco of unimpaired business capacity. From 1891 to 1893 nothing remained to be done but the affixing of his signature to that deed. It is not suggested that the deed was anything more than a simple mortgage. Now, this was no complicated transaction, no comparison of figures, no negotiation as to liability, no proposition on one side to be heard, discussed, considered, decided. It was a single act,— affixing his name to an instrument determined upon two years before, in the presence of witnesses. Using the language of Mr. Justice Field, supra, "It is evident that a very different degree of capacity is required for the execution of a complicated contract, and a single transaction, like the purchase or sale of a lot." Now, did Marco have at that time the mental capacity to do this act? To ascertain this, we must go to the facts testified to in the case. On 15th March, 1893, when Marco was in the mental condition testified to by experts and laymen, he executed a mortgage to S. Jerkowski, for $16,000, of lots in Darlington. The deed was executed in the presence of, and was witnessed by, Appelt, his close personal friend, adviser, and an earnest witness in this case. This mortgage has never, to this time, been questioned, or its validity disputed. Appelt saw and certified to its signing, sealing, and delivery. During this period, also, Marco changed his attorney; consulted Mr. Nettles about certain of his cases; instructed him in them. Among other things, he conferred with him about this proposed mortgage. Mr. Silverstein, a cousin of Marco, was consulted by Mrs. Marco upon the question of her renunciation of dower on this mortgage. He went to Darlington, saw Marco and Mrs. Marco, considered the whole situation, and advised her to renounce her dower. This is conclusive proof that this gentleman then had no doubt of the validity of the mortgage, else he would have been false to the trust Mrs. Marco imposed on him when she sought his counsel and protection. The fact that Marco had executed this mortgage was known to his family and friends. The record shows not one word of protest against it after its execution until the present complainant raised in the progress of this case the issue of his insanity. Many merchants and business men, including public officers, testify to the acts of Marco, their dealings in business with him, his management in these dealings, all during this same period, and all showing skill, ability, shrewdness, and even memory. Dr. Griffin, a physician of experience, and who was his family physician, saw no reason why he could not perform a simple act, not complicated in its nature. The extensive farming operations which Marco had been carrying on, by tenants and otherwise, were not interrupted. Appelt and Brice, his clerks, purchased a very large stock of goods in his name and on his credit. Can it be believed that these business men would have ventured to do this if Marco was habitually and continually void of intellect? But we are not left to probabilities deduced from attending occurrences. Nor are we without direct testimony on this subject. When Mrs. Marco, accompanied by Mr. Silverstein and her husband, visited Mr. Boyd, to state her conclusion, and to

express her consent to renounce her dower, he called Mr. Edwards into the room. There, in Mr. Edwards' presence, he stated to Marco what had been done, and Marco assented to it. This is his language, as reported by the master: He had stated that he was in Mr. Boyd's office on a day in 1893. (Other witnesses testified that he had been invited there specially by Mr. Boyd and his partner, Mr. Brown.) He was asked by Mr. Boyd who were present. Answer:

"Mr. Marco, his wife, Mr. Silverstein, and one or two others. I forget who they were. You stated that there had been some transaction between Mr. Marco and Mr. Pelzer, I think it was, and that it hadn't been completed, or there was some trouble about it, because it had been stated that Mr. Marco was unsound in mind, on account of drinking, and did not understand the transaction, and that you wanted him to say for himself whether he did understand it or not, and then you stated what the transaction was, and asked Mr. Marco whether he understood it, and whether he was willing to do it. He stated that he was, and that he did understand it."

Above all, we have the testimony of Mr. Boyd himself, who prepared the mortgage, in whose presence it was executed, to whom it was delivered. He had known Marco for years; had been his intimate friend and legal adviser for years. Knew him, his habits, his mental capacity, if any one knew them. He had himself noted the mental failure of Marco, and was on his guard. Above all, he knew that the act he was then engaged in was void,—worse than void,—if Marco had not then capacity to execute it. Mr. Boyd, in detail, states the whole transaction, and swears that Marco, at the time he made this mortgage, knew what he was doing. His testimony has been attacked with great earnestness and ability. If his testimony be disregarded, if the court adopts the view of it taken by counsel, then it must believe that a man of pure life and conversation, prominent in the profession of the law, honored and esteemed throughout the state, for the purpose of aiding one client, basely took advantage of an old friend and client, when he was non compos mentis, with full knowledge of his mental condition, and committed a foul wrong, crowning his infamy by wholesale perjury as a witness. Take a lower view of this matter. No one can question Mr. Boyd's ability in his profession. Yet it is contended that this able and acute lawyer took into his office an insane man, known to him to be insane, known to all the inhabitants of the town of Darlington to be insane, and induced him to sign a paper, the contents, purpose, and effect of which he had not mind enough to grasp; that is to say, induced this insane man to do an act any tyro in the profession would know was either void, or easily avoided. Not only so, but having done all this,—having obtained this deed of questionable value,—upon the strength of it he gave up valuable securities, the property of Mr. Pelzer,—and this not on the impulse of the moment, but after full time of calm and deliberate reflection. This conclusion cannot receive the sanction of the court. Mr. Boyd, in his sworn testimony, after detailing the facts leading up to the execution of the papers, and which have been stated, says:

"That brings us to the execution of the papers. After I had prepared them and got them ready, I recollected what Dr. Griffin had said about his appre-

hensions concerning Marco's mind if he continued drinking, and, as I knew of his excessive drinking, it occurred to me that it was due Mr. Pelzer and Mr. Marco, from me, representing both, that it would be the proper thing not to proceed with the execution of important papers without hearing what Dr. Griffin would then say as to his condition; not that I felt any apprehension myself, because I was then certain as I am now that Mr. Marco was capable of attending to the matter. I thought it was proper to see him before going on, though, and saw him. I gave him a general statement of what I proposed to have done, and asked him to go to Mr. Marco's store, have a talk with him, not letting him know what he came for, and then to come up and let me know if he was in condition to attend to papers of such importance. Dr. Griffin stated that Marco seemed to be quite bright and clear that morning; that he could not see any objection to his attending to the matter,—and thereupon I at once sent for Marco to come. I read over the papers, and we then sat and had a long talk over the terms of the papers, and also as to the business generally. I cannot recollect the line of that talk, or the particulars of it, except two matters I recollect very distinctly in regard to these papers: Mr. Marco said that in his embarrassed condition he would not be able to pay so large a debt in five years, and begged me to change that and make it ten years, so as to give him that time. I told him that he must recollect he had already obtained by the delay since '91, two years; that five years was his own proposition, and that I could not make the discharge without communicating with Mr. Pelzer, and that would be further delay; and that he knew Mr. Pelzer well enough to know that he would not be exacting if he failed to pay the debt in the time. He seemed satisfied with that. Speaking of the land Mr. Pelzer had as security, he said he thought Mr. Pelzer was so amply secured he ought to let me turn over to him all the bonds and mortgages I held, and not hold the seven fresh bonds and mortgages which I had to secure the interest that had accumulated from 1891. I didn't have the same estimate that he had of the value of the land property. I recollect that I calculated the interest from '91 so as to show him how large an amount had accumulated, called his attention to the terms of the agreement, to the effect that he should pay up all interest by the 1st of December, 1893; that, in his condition, I did not see how he could get the money to do so, except out of these bonds; and that they would be more likely to be collected in my hands than in his hands. That seemed to satisfy him, and nothing more was said about it. I recollect distinctly those two matters."

Dr. Griffin, who had in his earlier testimony expressed the opinion that Marco could at times sensibly attend to an ordinary transaction, but not conclude any complicated matter, indicates in his later testimony an inclination to doubt whether he gave the opinion to which Mr. Boyd refers, at the time which Mr. Boyd fixed. Both of them speak of an event which occurred two years before they went on the stand. Dr. Griffin is uncertain, and cannot enter into details. Naturally so. He had no interest whatever in the act to be done. Mr. Boyd did have such an interest, and he fixes the date thoroughly; acting, as he says, at once upon the opinion. There is no contradiction here.

From the testimony, it is clearly shown that, at the date of the execution of this mortgage, Marco had sufficient mind and memory to execute it. But there was another part of this transaction which must be inquired into. Upon the execution of this mortgage, Marco was entitled to receive the bonds and mortgages in the possession of Mr. Pelzer. When the mortgage was in fact executed, a portion of these bonds and mortgages were retained by Mr. Boyd for Mr. Pelzer, to secure certain unpaid interest. This was a new arrangement, a separate transaction, proposed to Marco for the first time at the execution of the mortgage. Now, Marco's mind and memory were greatly impaired by his habits,—his nerve

and will power, especially. Mr. Boyd represented both Mr. Pelzer and him. This Mr. Boyd, perhaps, could safely do, in completing an agreement carefully considered and agreed to by both parties in 1891, and wanting completion by the doing of a single act. But, when it came to the retention of the bonds and mortgages, this was solely for the benefit of Mr. Pelzer, securing him a preference in the estate of an embarrassed debtor, and in no sense for Marco's benefit. Under the circumstances, it should not stand. But Marco received and used the bonds and mortgages in extinguishing some debts, and in securing stay on pressing executions. If, therefore, the transaction be set aside, it cannot be done without putting the parties in statu quo. No doubt is entertained of the good faith existing, nor is it supposed that a fraud was perpetrated. But in the situation of these parties, the dual capacity of the counsel, the mental infirmity of one client, the one present, his inability to go into a transaction of a complicated character, the natural subserviency of his will to his long known and trusted adviser, these reasons induce the setting aside of the arrangement, however unconscious Mr. Boyd may have been of the bias under which he was laboring, or of the unfairness of the result to Marco. But, before the arrangement can be set aside, both parties must be put in statu quo. The plantation, Lydia, has been offered for sale in this case. At that time there was no doubt as to Mr. Pelzer's right to his mortgage of it, and his bid at the sale had a vastly superior advantage over that of any one else. He purchased it on his own terms. Under these circumstances, the sale will not be confirmed. Time will be given, and steps will be taken to ascertain the value of the securities received by Marco from Pelzer, and used by him. Reasonable time will be given to him to replace them or return their value. Failing in this, the plantation will be sold, and the proceeds used first in reimbursing Mr. Pelzer, for the value of the bonds and mortgages surrendered by Mr. Boyd to Marco when the execution of the mortgage of Lydia was completed, and the remainder to go to Marco, or to be applied as the law may direct.