The COMMITMENT OF Michael FISHER, Appellant,

v.

The STATE of Texas, Appellee.

No. 13–01–00714–CV.

Court of Appeals of Texas, Corpus Christi–Edinburg.

Dec. 18, 2003.

---

Kenneth W. Balusek, Civil Commitment Services, State Counsel for Offenders, Hunstville, for appellant.

Autumn Lewis, Special Prosecution Unit, Hunstville, for appellee.

## OPINION

WITTIG [1], Justice.

Michael Fisher appeals his indeterminate commitment. The commitment was under the relatively new Texas Sexual Violent Predator Act, effective September 1, 1999. Fisher raises four complaints; two are issues of first impression. First he attacks the sexually violent predator statute (SVP) as punitive, both facially and as applied, because Fisher does not have the mental ability to understand or comply with the order of commitment. Second, Fisher argues his due process rights were violated when he was forced to proceed to trial when he was incompetent. His argument includes the contention he was denied the opportunity to exercise his right to counsel. We will treat the competency issues generally together.[2] In his third issue, he attacks the SVP statute and commitment order as unconstitutionally vague. Finally, Fisher claims his fifth amendment privilege against self-incrimination was violated because Fisher was compelled to testify against himself.[3]

We will only address Fisher's complaints concerning his mental incapacity. Unchal-

---

1. Retired Justice Don Wittig assigned to this court by the Chief Justice of the Supreme Court of Texas pursuant to TEX. GOV'T CODE ANN. § 74.003 (Vernon Supp.2004).

2. These issues are likely intertwined under the United States Supreme Court's holding in *Seling v. Young*, 531 U.S. 250, 263–64, 121 S.Ct. 727, 148 L.Ed.2d 734 (2001) (if a statute is

already held to be a civil statute, then the statute cannot be unconstitutional "as applied").

3. The Beaumont Court of Appeals has recently addressed these latter issues in a plurality opinion which we discuss and reference below.

lenged psychiatric and psychological testimony showed both Fisher's inability to understand the proceedings against him, and his inability to cooperate with his attorney in his own defense. Fisher also argues his entitlement to a competency hearing before being subjected to a trial as a sexually violent predator. We agree. Because we reverse and remand on the competency issues, we do not address his other complaints.

I

The State of Texas filed a petition in District Court in Montgomery County, Texas, to commit Michael Fisher as a sexually violent predator. Fisher requested a hearing to determine his competency to stand trial. The motion asserted that Fisher had neither a sufficient present ability to consult with counsel with a reasonable degree of rational understanding, nor a rational as well as factual understanding of the proceedings against him. The motion further stated Fisher was an inpatient at the Institutional Division of the Texas Department of Criminal Justice when the petition was filed. While at the mental facility, Fisher had episodes of psychotic behavior and was diagnosed with schizophrenia, paranoid type, and antisocial personality disorder. Fisher was also said to be at least mildly retarded. The assigned visiting trial judge initially granted the motion for a competency hearing. The trial court then denied the motion for competency hearing but liberally allowed a bill of exception.

In the offer of proof, two mental health experts testified. Fred Fason, M.D., a psychiatrist, graduated from Baylor University College of Medicine, and was a World War II veteran. He had been court appointed for clinical evaluations some 2000 times. Dr. Fason testified Fisher was "totally unable to cooperate and communicate with [his attorney] and engage him in legal activities." The doctor stated Fisher had neither a factual nor rational understanding of the proceedings against him. Dr. Fason further testified Fisher was mildly retarded, with an I.Q. in the lower 60's. Fisher's paranoia would lower his scores, and schizophrenia lowered his cognitive abilities. According to the psychiatrist, Fisher in no way could conform to the terms of a treatment program, and was doomed to failure if he were put on outpatient treatment. Dr. Fason's descriptions of Fisher included paranoia, schizophrenia, delusional and psychotic. "His view of himself and of his situation is so unrealistic that it's psychotic." Fisher was not capable of reading the MMPI,[4] which requires a sixth grade education to accomplish. While Fisher could spell "house," he could not spell "table" or "judge." Finally Dr. Fason testified that Fisher thought the present proceedings were "about trying to send me to a halfway house." According to the testimony, Fisher thought he would have to sign for the program and, because he would refuse to sign, he would then be released. Dr. Fason opined there was no way Fisher could stand trial competently.

The State neither cross-examined Dr. Fason nor otherwise challenged his testimony.

Dr. Floyd Jennings, psychologist and attorney, also testified Fisher lacked both factual and rational knowledge of the proceedings. Dr. Jennings further testified Fisher was unable to assist his attorney in preparation of his defense. Dr. Jennings

---

4. Minnesota Multiphasic–II. Although Fisher thought he could read and write at an eighth grade level, medical testimony indicated it was more like a fourth grade level-illustrated by Fisher's inability to read the test.

also had expertise in sex treatment programs. He stated that sex treatment programs are verbally intensive, and require a modicum of intellect to effectively participate; this ability is lacking in Fisher. He is incapable of participating and benefitting from a program for sex offender treatment "because he could not understand what is asked of him." According to Dr. Jennings, to order Fisher to participate in a sex treatment program is virtually a sham. "[A] word 'sham' seems too strong, but it would be one wherein the defendant or the patient would be anticipated to fail because he could not understand what is asked of him."

The State offered a limited cross-examination of Dr. Jennings. Dr. Jennings opined that he thought of Fisher as dangerous to himself primarily and, secondarily, to a lesser extent, dangerous to others under the conventional commitment law. *See* TEX. HEALTH & SAFETY CODE ANN. §§ 574.034–.035. (Vernon 2001). Dr. Jennings admitted he disagreed with the State's attorney regarding commitment of sexually violent predators. Dr. Jennings also offered an alternative to sexually violent predator commitment. Dr. Jennings suggested Fisher should be given protective custody and emergency detention under the conventional civil commitment laws. Fisher could then be properly treated at Vernon State Hospital.

After Fisher's proffer of proof, the trial court observed that neither Chapter 841 of the Health and Safety Code, nor any other provision in the civil law gives leave to a competency determination, before going forward with trial on the issues under Chapter 841. This oral pronouncement is verified by the court's order dated May 29, 2001. The trial court concluded that a determination of competency to stand trial is neither required nor appropriate. The court observed: "I think the very nature of the proceeding it may well be if the legislative intent is to be followed that frequently there will be respondents who are not, in the sense of a criminal proceeding, competent to stand trial." Indeed, we agree with the trial court's studied conclusion that mental competency is not required by the statute.

At trial, the 36–year old Fisher was called to the stand for testimony by the State and cross-examined about his prior convictions and other misdeeds. The two prior felony convictions that enabled the State to seek commitment were sexual assaults. Both offenses occurred in 1987 and he pled guilty to both. Fisher claimed these offenses were with prostitutes who wanted more money, that he was not guilty, but other factors prompted his plea. Fisher violated his community supervision three times and was re-incarcerated. During probation he assaulted his wife. However, none of the probation violations were sexually related. One of the violations included his removal of a satellite monitoring device, not unlike the device he now wears. A jury found Fisher was a sexually violent predator. The trial court signed and entered a final judgment and order of commitment. The judgment requires Fisher, in addition to not contacting his two 1987 victims, not to participate in programs with persons 17 or younger, to stay 1000 feet from where children commonly are, not to consume alcohol or controlled substances, and not to leave Texas or to change his home residence without court approval, *inter alia*. Fisher was also ordered, upon release from lock-down, to be fitted with electronic satellite monitoring equipment by the Texas Department of Public Safety for around the clock monitoring. There are 11 disabilities and restrictions under the judgment and 97 more under the commitment requirements.

The "civil commitment requirements" expand the disabilities and restrictions of the final judgment and order of commitment. These additional restraints consist of 97 separate requirements of Fisher's "treatment and supervision contract." The second and fourth paragraphs of the judgment's commitment order incorporate these additional restraints by ordering: "Michael Fisher shall follow the directive of his case manager in matters related to his residence selection and rules." The civil commitment requirements are also attached and incorporated into the final judgment.

We observe a few of the provisions from the civil commitment requirements.[5] Fisher is forbidden to have *contact with* or harass program staff or volunteers. Many rules require his cooperation with his case manager and staff as well as adherence to any future treatment plans. Contact with family members is forbidden unless approved by the case manager and staff. Family members may be required to submit to criminal background checks. R-rated movies or TV programs are forbidden unless discussed with case manager and staff. Fisher may not go to schools, swimming pools, movie theaters, public libraries, amusements parks, arcades, or malls where children or potential victims are likely to be. He cannot work anywhere that requires contact with women or children. Fisher may not touch anyone without their permission. Fisher may not use drugs or drink any alcohol. Fisher may not buy, borrow, steal, possess, or use cameras, recorders, CD or DVD recorders,

or any other recording device. He cannot use a post office box, pick up hitchhikers, or stop to render aid to someone stranded on a road. He cannot use an automobile or travel without permission. He must constantly wear a tracking device and submit to polygraph tests. There is no confidentiality[6] of anything he tells counselors. Conversely, Fisher may not disclose the identity of anyone in the program. Finally, Fisher must report any violation by him to his case manager.

## II

Fisher challenges whether due process applies to a SVP proceeding. If due process applies, then the procedural and substantive safeguards of due process cannot be enjoyed by a person who cannot rationally or factually comprehend the hearing. Fisher argues from *Addington:* "This Court has recognized that civil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection." *Addington v. Texas,* 441 U.S. 418, 425, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979).

Fisher further observes other proceedings analogous to SVP proceedings trigger due process protections because they too can result in loss of liberty. *See In re M.A.F.,* 966 S.W.2d 448, 450 (Tex.1998). Because contempt proceedings are quasi-criminal they trigger due process concerns. *Hawkins v. Walvoord,* 25 S.W.3d 882, 892 (Tex.App.-El Paso 2000, pet. denied). Additionally, a hearing for protective order in a divorce case involves liberty issues because a person's freedom of

---

**5.** Copies of the judgment, order of commitment and civil commitment requirements (exhibit C to the judgment) are attached as Appendix 1 to this opinion.

**6.** Some database information is confidential. Other provisions require attendance with counseling and detail sexual conduct re-

straints ranging from sadomasochism to masturbation to deviant fantasies. The listing above is not in the least inclusive. Only some of the 97 additional requirements are mentioned to illustrate the breadth and depth of liberty interests involved and disabilities imposed under the law.

movement is restricted. This process too is a quasi-criminal proceeding implicating due process. *Striedel v. Striedel,* 15 S.W.3d 163, 166 (Tex.App.-Corpus Christi, 2000 no pet.). Fisher posits that all these proceedings can result in the deprivation of liberty. The SVP proceedings result in deprivation of liberty because a person so committed is greatly disabled from going places and contacting people—even family members. Every aspect of his life is affected, from his every movement to each personal contact.

Fisher further contends due process requires a person to be aware of and be able to participate in the proceedings against him. The proof showed Fisher was unable to understand or assist his attorney in preparation for trial or the trial itself. His appellate counsel argues, though Fisher was granted the right to have an attorney and attend his trial, "since Fisher was incompetent, that right was a hollow right."

■ Finally, Fisher argues from *Thompson v. Cockrell,* 263 F.3d 423, 427 (5th Cir.2001). Due process dictates protection of the individual against arbitrary action of the state and ensures that adequate procedure exists to protect a substantive interest to which a person is entitled. *See id.* We also are reminded by *Thompson* that liberty interests emanate from either the Due Process Clause itself or from state law. *Id.* at 425. The State concurs that substantive due process prevents the government from engaging in conduct that "shocks the conscience," citing *Rochin v. California,* 342 U.S. 165, 172, 72 S.Ct. 205, 96 L.Ed. 183 (1952). Due process prevents governments from interfering with rights "implicit in the concept of ordered liberty." *Palko v. Connecticut,* 302 U.S. 319, 325–26, 58 S.Ct. 149, 82 L.Ed. 288 (1937). We agree.

■ The State expands its due process argument by citing *Allen v. Illinois,* 478. U.S. 364, 372, 106 S.Ct. 2988, 92 L.Ed.2d 296 (1986). "*Addington* demonstrates that involuntary commitment does not itself trigger the entire range of criminal protections." *Id.* The State argues that the SVP statute is not quasi-criminal because the United States Supreme Court has consistently held such statutes to be *civil* in nature, citing *Kansas v. Hendricks,* 521 U.S. 346, 361–65, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997); *Seling v. Young,* 531 U.S. 250, 260–61, 121 S.Ct. 727, 148 L.Ed.2d 734 (2001); and *Allen,* 478 U.S. at 372, 106 S.Ct. 2988. The State says that the Chapter 841 rights given to Fisher from the criminal law do not change the statute from civil to criminal. We agree that the granting of rights associated with criminal trials, standing alone, does not make the statute criminal. The State also argues that giving some safeguards applicable in criminal trials does not turn the proceedings into criminal prosecutions requiring the full panoply of rights applicable in criminal proceedings. It cites *Allen,* 478 U.S. at 372, 106 S.Ct. 2988. However *Allen* also notes that the fact incarceration may result (which is uniquely the case in Texas) is relevant to the question whether the privilege against self-incrimination applies. *Id.* We also note that Allen's commitment, unlike Fisher's commitment, was for actual treatment at a psychiatric hospital. *Id.* at 373, 106 S.Ct. 2988. So the gist of the State's position boils down to its argument, that the SVP statute is civil, therefore not quasi-criminal or criminal. Accordingly, the State contends Fisher has no due process right in being sane at his hearing or being able to assist counsel at the commitment hearing. We disagree.

We first address Fisher's liberty and due process claims, then undertake the issue of whether or not the statute is punitive.

■ There is no question that Fisher has a liberty interest in his commitment proceedings. Both substantive and procedural due process are mandatory. In *Foucha*, the State of Louisiana sought to perpetuate Foucha's confinement on the basis of his antisocial personality that rendered him a danger to himself or others. *Foucha v. Louisiana* 504 U.S. 71, 78, 112 S.Ct. 1780, 118 L.Ed.2d 437 (1992). The court first observed that even if constitutionally permissible, keeping Foucha against his will in a mental institution is improper absent a civil commitment proceedings of *current mental illness* and dangerousness. *Id.* (Texas makes no requirement of current mental illness and dangerousness.) A convicted felon has a liberty interest in not being transferred to a mental institution without appropriate procedures to prove he is mentally ill. *Id.* at 78–79, 112 S.Ct. 1780. A convicted criminal who allegedly was mentally ill was entitled to release at the end of his term unless the State committed him in a civil proceeding. *Id.* at 79, 112 S.Ct. 1780 (citing *Baxstrom v. Herold*, 383 U.S. 107, 86 S.Ct. 760, 15 L.Ed.2d 620 (1966)). "[T]here is no conceivable basis for distinguishing the commitment of a person who is nearing the end of a penal term from all other civil commitments." *Jackson v. Indiana*, 406 U.S. 715, 724, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972) (quoting *Baxstrom*, 383 U.S. at 111–112, 86 S.Ct. 760). Due process contains a substantive component that bars certain arbitrary, wrongful government actions "regardless of the fairness of the procedures used to implement them." *Zinermon v. Burch*, 494 U.S. 113, 125, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990); *see also Salerno*, supra, 481 U.S. at 746, 107 S.Ct. 2095; *Daniels v. Williams*, 474 U.S. 327, 331, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). Freedom from bodily restraint has always been at the core of the liberty protected by due process from arbitrary governmental ac-tion. *Youngberg v. Romeo*, 457 U.S. 307, 316, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982). "It is clear that commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection." *Jones v. United States*, 463 U.S. 354, 361, 103 S.Ct. 3043, 77 L.Ed.2d 694 (1983). We should never "minimize the importance and fundamental nature" of the individual's right to liberty. *Salerno*, 481 U.S., at 750, 107 S.Ct. 2095; *Foucha*, 504 U.S. at 79–80, 112 S.Ct. 1780.

Texas's highest criminal court recently held, together with the majority of states, that to give effect to a petitioner's right to counsel and his right to test the legality of his arrest in the extradition context, he must be sufficiently competent to consult with his counsel. *Ex parte Potter*, 21 S.W.3d 290, 296–97 (Tex.Crim.App., 2000). "Given that an alleged fugitive is entitled to counsel and entitled to challenge the legality of his arrest and assert defenses on the basis of which the extradition warrant may be dismissed, the accused must be sufficiently competent to discuss with his counsel facts relating to the limited defenses that may be raised." *Id.* (citations omitted); *cf. Ake v. Oklahoma*, 470 U.S. 68, 77, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985) (due process requires the state to grant indigent access to basic materials integral to building of effective defense). "Counsel cannot provide effective representation absent the ability to consult with the alleged fugitive regarding potential defenses about which he may have knowledge." *Ex parte Potter*, 21 S.W.3d at 297. "Where the fugitive's incompetence prevents him from being able to consult with his counsel in connection with the issues of his identity and presence, those defenses may be foreclosed." *Id.* The court concluded that while the broadest understanding of the proceedings and greater ability to consult with counsel is not necessary,

due process requires that the alleged fugitive has sufficient mental competency to consult with and assist counsel on the issues of identity and presence.

The Supreme Court in *Dexter v. Hall,* 82 U.S. (15 Wall.) 9, 21 L.Ed. 73 (1872), held that a mental incompetent cannot be held to his contract:

> [A] person non compos mentis, has nothing which the law recognizes as a mind, and it would seem, therefore, upon principle, that he cannot make a contract which may have any efficacy as such. He is not amenable to the criminal laws, because he is incapable of discriminating between that which is right and that which is wrong. The government does not hold him responsible for acts injurious to itself. Why, therefore, should one who has obtained from him that which purports to be a contract be permitted to hold him bound by its provisions, even until he may choose to avoid it? If this may be, efficacy is given to a form to which there has been no mental assent.

*Id.* at 20. So we ask, if a person cannot contract away his property without mental capacity, can the government force an incompetent to sign a civil commitment contract the person cannot comprehend or keep? May mentally retarded persons sign away their liberties? Fisher was ordered to sign such a contract.

■ In Texas, a person such as Fisher, suffering from a mental illness, is guaranteed all the rights, benefits, responsibilities and privileges afforded by the constitutions and laws of the United States and Texas. *Barclay v. Campbell,* 704 S.W.2d 8, 11 (Tex.1986) (citing TEX.REV.CIV.STAT. ANN. art. 5547–80(a) (Vernon Supp.1985) (Barclay's mental illness did not foreclose his right to be informed of material risk that could influence a reasonable person in making a decision to give or withhold consent to a medical procedure)).

■ We have held that the standard for incompetence to determine whether a person is mentally ill, mentally retarded, or both, did not violate due process where each category protects equally. *Villarreal v. State,* 860 S.W.2d 529, 535 (Tex.App.-Corpus Christi 1993, pet. ref'd). In *Villarreal,* the portions of the statute that deal with the conditions of mental illness or retardation disjunctively, are those that refer to institutional placement and treatment options. *Id.* The standard for incompetence is the same whether the person is mentally ill, mentally retarded, or both, under conventional civil commitments. *Id.* Yet the Texas SVP act, while facially claiming to be a civil commitment statute, does not afford the equal protection of the conventional civil commitment act. To the contrary, the act does not provide for the mentally ill or mentally retarded. Thus the act meets neither the due process requirements for those mentally ill or retarded, nor does it meet the due process requirements of the criminal law. Additionally, the law fails to meet constitutional muster as a true civil commitment because of the absence or any lack-of-control determination. *Kansas v. Crane,* 534 U.S. 407, 412, 122 S.Ct. 867, 151 L.Ed.2d 856 (2002).[7] The law fails to meet constitutional muster as a criminal statute because it fails to follow criminal procedures for the allegedly mentally incompetent. TEX. CODE CRIM. PROC. ANN. § 46.03 (Vernon 2001). In other words, the Texas SVP act, as noted by the trial judge and the State, does not provide for mental incompetency, although many liberties are affected. Thus, the mentally incompetent is deprived of both treatment under the con-

---

**7.** We discuss some of the implications of *Crane* below.

ventional mental health laws, and of the protections of certain criminal rights. Yet the Texas law lacks the United States Supreme Court-mandated finding that the offender cannot control his sexual impulses. According to the United States Supreme Court, If offenders could control their sexual deviancies, they would be subject to the criminal law. *Crane*, 534 U.S. at 412, 122 S.Ct. 867 (sexual offenders subject to civil commitments must be distinguished from other dangerous persons more properly dealt with in the criminal proceedings).

■■■ Because the SVP statute provides for assistance of counsel, due process requires a person to be able to enjoy that protected right. *Little v. Streater*, 452 U.S. 1, 16, 101 S.Ct. 2202, 68 L.Ed.2d 627 (1981) ("[A] statute ... may be held constitutionally invalid as applied when it operates to deprive an individual of a protected right although its general validity as a measure enacted in the legitimate exercise of state power is beyond question."). According to the record, Fisher lacked factual and rational knowledge of the proceedings and was unable to assist his attorney prepare a defense. "[A] State must afford to all individuals a meaningful opportunity to be heard if it is to fulfill the promise of the Due Process Clause." *Boddie v. Connecticut*, 401 U.S. 371, 379, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971). We hold that the unchallenged lack of mental competency to assist his attorney deprived Fisher of a meaningful opportunity to be heard. *See Powell*, 579 F.2d at 330; *Ex parte Potter*, 21 S.W.3d at 296–9. The fundamental requirement of due process is the opportunity to be heard "at a meaning-ful time and in a meaningful manner." *Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965); *Grannis v. Ordean*, 234 U.S. 385, 394, 34 S.Ct. 779, 58 L.Ed. 1363 (1914).

We conclude that whether the SVP is civil or quasi-criminal, Fisher's liberty interests in a fair proceeding, including his statutory right to counsel, were violated. His due process rights were violated because competent evidence indicated his incapacity both to participate in the proceeding in an effective way and his demonstrated inability to factually or rationally utilize his right to counsel.

## III

Next we address the State's contention that the SVP statute is a purely civil statute and therefore does not afford many criminal due process guarantees to Fisher.[8] At the same time, we address Fisher's related issue that the statute is punitive facially, and as applied, because Fisher does not have the mental ability to understand or comply with the order of commitment. Furthermore, if the statute is punitive, then there are additional reasons why Fisher clearly has the right to be sane at his hearing, able to assist counsel, and is entitled to a hearing on competency before proceeding.

The State argues, and we agree, that the "as applied" argument may not apply if the SVP statute is civil. The argument is by extrapolation. The United States Supreme Court in construing the Washington SVP statute, held that such an act could not be unconstitutional "as applied" when

---

8. The SVP statute grants several criminal law safeguards, including findings beyond a reasonable doubt, the right to counsel at the proceeding stage (but not the initiation phase) and trial by jury. By omission, the act denies the safeguards against double jeopardy, *ex* *post facto* application, the right of mental competency, and the right against self-incrimination. *See generally Beasley v. Molett*, 95 S.W.3d 590 (Tex.App.—Beaumont 2002, no pet. h.).

that state's supreme court and the Ninth Circuit had already held the statute to be civil in nature. *Seling,* 531 U.S. at 264–65, 121 S.Ct. 727 [9] (in context of double jeopardy and *ex post facto* claims, "as applied" analysis would prove unworkable because such analysis would never conclusively resolve which particular scheme is punitive). The State argues: "If Fisher were subjected to the criminal penalty clause, he would then be afforded all of the procedural safeguards offered to criminal defendants." Texas criminal law clearly proscribes the trial of a mentally incompetent person. Thus, if the Texas SVP statute is punitive in purpose or manifest effect, Fisher is entitled to a competency hearing before proceeding to the initial commitment trial.

The State expands its ripeness argument countering Fisher's claim that he is doomed to violate the terms of commitment because he cannot understand the orders. Citing *Patterson v. Planned Parenthood,* 971 S.W.2d 439 (Tex.1998), the State argues that uncertain or contingent future events may not occur. *See Id.* at 442. The proper course for Fisher is to challenge the criminal penalty clause after that portion has been applied to him. While the State's argument is not without some merit, it ignores the thrust of Fisher's argument. Fisher argues the SVP act is objectively punitive and retributive in multiple aspects, not merely because it attaches felony penalties. Alternatively, if the State is correct that *Seling* prohibits an "as applied" analysis after a statute has

been found to be civil, then Fisher could be prohibited from raising this argument later after being criminally charged. *See Seling,* 531 U.S. at 265–264, 121 S.Ct. 727.[10]

Both parties aptly cite and argue from *Hendricks,* 521 U.S. 346, 117 S.Ct. 2072, 138 L.Ed.2d 501.[11] We are constrained to note that *Hendricks* is a plurality opinion by Justice Thomas, joined by Chief Justice Rehnquist and Justices O'Connor and Scalia. Justice Kennedy filed a concurrence and warned that mental and medical treatment should not be a sham for punishment. Justices Breyer, Stevens, Souter and Ginsburg dissented to parts of the majority opinion. The State argues, and we agree, that the Kansas law is similar to the Texas SVP statute. However, we note striking and material differences, best exemplified by following the *Hendricks* analysis and its application of the *Kennedy* factors. *Kennedy v. Mendoza–Martinez,* 372 U.S. 144, 168–69, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963).

The categorization of a statute or proceeding as civil or criminal is first of all a question of statutory construction. *Hendricks,* 521 U.S. at 361, 117 S.Ct. 2072. If the Legislature meant to establish "civil" proceedings, we should ordinarily defer to its intent unless there is the clearest proof that the scheme is so punitive in purpose or effect that it negates the State's attempt to deem that statute civil. *Id.* (citing *United States v. Ward,* 448 U.S.

---

**9.** The Court also noted the Washington commitment scheme was similar and largely patterned on the Kansas statute. *Id.* As we will discuss, the Texas scheme is also similar to Kansas but contains very significant differences leading to our conclusion that, unlike Kansas, the Texas SVP statute is designed for retribution or deterrence (punitive).

**10.** The State is correct Fisher could claim insanity at the time of the violation of the

criminal penalty clause, but as we discuss below, lack of competency at the initial commitment hearing would probably be no defense.

**11.** The State's argument largely tracks *Hendricks.* Where it expands on the *Hendricks* holding, we trust we fully address its arguments.

242, 248–49, 100 S.Ct. 2636, 65 L.Ed.2d 742 (1980)).[12] Unlike the face of the Kansas statute, which suggested only the creation of a civil statute, the face of the Texas statute imposes severe criminal penalties for the violation of any of the terms of commitment. TEX. HEALTH & SAFETY CODE ANN. § 841.085 (Vernon 2000). The criminal penalty facially provides: "A person commits an offense if the person violates a requirement imposed under Section 841.082. An offense under this section is a felony of the third degree." *Id.* Because Fisher, and most all prisoners,[13] have two prior felony convictions in order to invoke the act, they automatically fall under Texas' felony enhancement scheme. Thus, under Texas law, virtually any conviction of violation of the SVP act mandates a minimum penitentiary term of 25–99 years. TEX. PEN. CODE ANN. § 12.42(d) (Vernon 1999). A mandatory life sentence follows the conviction for any violation of § 841.085 of the Health and Safety Code if the committed person is previously convicted of aggravated sexual assault. *Id.*

§ 12.42(d)(2)(B)(ii). In practical legal effect, if Fisher or anyone with a prior aggravated sexual assault conviction, uses a post office box or stops to help a person "stranded on the road" that person is subject to a mandatory life sentence.[14] The effect of disobedience to the SVP statute, requiring imprisonment for up to life, clearly embraces the primary objectives of criminal punishment: retribution and deterrence. It is retributive because it punishes for past criminal conduct. It is also patently a deterrent; a violation of the terms of commitment could mean between 25 years incarceration up to and including a mandatory life sentence. While the Texas act, like Kansas, initially states it is a civil act providing for civil commitment proceedings, unlike Kansas, the teeth of the Texas law are severe criminal penalties. This objective manifestation of the law is punitive.

We are not informed of any state that attaches felony penalties to its SVP statute, except Texas.

**12.** It should be noted that the origin of this expression is *Flemming v. Nestor,* 363 U.S. 603, 617, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960). In context, *Flemming* warns against judicial inquiry into Congressional motives-at best hazardous-especially when that inquiry goes behind objective manifestations. But in upholding termination of social security benefits, the Court noted this was but a small part of an extensive revision of social security program. *Id.* The Court held that a punitive desire to punish could not be shown to have motivated the legislature to revise the law and terminate certain benefits. "(I)t is not on slight implication and vague conjecture that the legislature is to be pronounced to have transcended its powers, and its acts to be considered as void." *Id.* at 618, 80 S.Ct. 1367 (citing *Fletcher v. Peck,* 10 U.S. (6 Cranch) 87, 128, 3 L.Ed. 162 (1810)). Taking heed, we look solely and only at stated intentions and *objective manifestations.* We note, however, that the *Flemming* Court found that no affirmative disability or restraint was imposed, and certainly nothing approaching the

"infamous punishment" of imprisonment. *Id.* at 617, 80 S.Ct. 1367.

**13.** The statute requires the commitment proceedings commence while a person twice convicted of a sexually violent crime is still incarcerated (thus a prisoner). Likewise a person found not guilty of a sexually violent crime by reason of insanity is then subject to SVP commitment before he is released from his civil commitment. *See* § 841.021 et seq., TEX. HEALTH & SAFETY CODE ANN (Vernon 2000). If an insane person no longer shown to be insane, were then committed under the SVP statute and did not have two prior sexual felony convictions, then a member of that limited class would not be subject to the felony sentencing *enhancement* requirements. Such a person would still be subjected to felony criminal penalties.

**14.** See items number 48 and 55 respectively of the "Civil Commitment Requirements: Treatment and Supervision Contract," Appendix "A."

The State argues that if Fisher were indicted for violating any provision of the SVP statutes, he would then be "afforded all of the safeguards offered to persons facing criminal charges." Such argument begs the question of Fisher's rights at the proceeding in question. A promise of possible future protection does little to address the deprivation of present rights. Any prospective insanity defenses would only address his mental state at the time of a violation or his subsequent criminal trial. We know of no Texas law that would allow a person's mental disabilities at the time of his SVP commitment hearing to be a defense to subsequent prosecution. Certainly the SVP statute provides no such protections.

*Hendricks* notes that Kansas places its SVP statute in its probate code, not its criminal code, thus evidencing intent of the civil nature of the statute. *Hendricks*, 521 U.S. at 362, 117 S.Ct. 2072. In somewhat similar fashion, Texas places its SVP statute in its Health and Safety Code. Unlike Kansas, Texas also places some of its highest priority crimes in its Health and Safety Code. Many felony and misdemeanor drugs crimes are found in the Health and Safety Code Chapters 481, 482, 483 and 485. These chapters delineate hundreds of criminal offenses, including manufacturing and distribution of controlled substances, dangerous drugs and abusable chemicals. Several other chapters of the Health and Safety Code deal with criminal statutes and penalties. These include: Chapters 195, 341, 501, 765 and 793, *inter alia.* We conclude that the code placement in Texas does not necessarily implicate the act as civil, and rather is consistent with the placement of other criminal laws.[15] The

manifest punitive intent of many provisions of the Health and Safety Code is apparent.

■ Like Kansas, the Texas act states it is civil. *See Hendricks,* 521 U.S. at 361, 117 S.Ct. 2072. The Texas Legislature found "that a civil commitment procedure for the long-term supervision and treatment of sexually violent predators is necessary and in the interest of the state." TEX. HEALTH & SAFETY CODE ANN. § 841.001 (Vernon 2001). However, "It is well settled that realities rather than benign motives or non-criminal labels determine the relevance of constitutional policies." *In re Winship,* 397 U.S. 358, 365–366, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970); *In re Gault,* 387 U.S. 1, 21, 27, 50, 87 S.Ct. 1428, 18 L.Ed.2d 527, (1967); *Breed v. Jones,* 421 U.S. 519, 528, 95 S.Ct. 1779, 44 L.Ed.2d 346 (1975); *Allen,* 478 U.S. at 369, 106 S.Ct. 2988.

The *Hendricks* Court held that the Kansas Act does not implicate either of the two primary objectives of criminal punishment: retribution or deterrence. *Hendricks,* 521 U.S. at 361–62, 117 S.Ct. 2072. According to our highest court, Kansas law is not retributive because prior criminal conduct is used solely for evidentiary purposes to show mental abnormality or to support a finding of future dangerousness. *Id.* at 352, 117 S.Ct. 2072. Texas law decidedly differs. The Texas SVP statute begins and ends with criminal penalties. First, multiple prior sexually violent convictions are a fundamental and jurisdictional requirement of the act. Section 841.003(b) provides: "A person is a repeat sexually violent offender for the purposes of this chapter if the person is convicted of more than one sexually violent offense and a sentence is imposed for at least one of

15. Indeed, the SVP statute in Chapter 841, immediately follows Chapter 840, which deals with the sterilization of cats and dogs. Certainly few would be so emboldened to argue this statutory nexus is material.

the offenses or...."[16] TEX. HEALTH & SAFETY CODE ANN. § 841.003(b)(Vernon 2000). Without two or more prior sexually violent convictions or the statutory equivalent, no proceedings may be initiated. *Id.* The statute further specifies the jurisdiction of either the Texas Department of Criminal Justice, or the Texas Department of Mental Health and Mental Retardation, to file appropriate notices sixteen months before the release of a convicted or committed violent sex offender. *Id.* § 841.021(c). Unlike the *Hendricks* Court holding that past conduct is used "solely for evidentiary purposes," past criminal conduct is a *sine qua non* for the initiation of Texas proceedings. Likewise, the nature of past criminal conduct is jurisdictional not only as to agency responsibility but also before any trial court can entertain such an action.

It is instructive to note *Hendricks* reliance on *Allen*, 478 U.S. at 371, 106 S.Ct. 2988. *Allen* in turn relies on the Illinois Supreme Court holding in *People v. Allen*, 107 Ill.2d 91, 89 Ill.Dec. 847, 481 N.E.2d 690 (1985). There, the Illinois court construed its SVP statute as requiring proof of three separate elements: (1) the existence of a mental disorder for more than one year; (2) the existence of criminal propensities to the commission of sex offenses; and (3) the existence of demonstrated propensities toward acts of sexual assault or acts of sexual molestation of children. *Id.* at 697. Because the Illinois statute required more than propensity to commit a sex offense, that state required additional proof that the defendant has "demonstrated" this propensity. *Id.* Thus, the State had to prove at least one act or attempted act of sexual assault or sexual molestation. *Id.* "There is, however, nothing in the statute requiring the State to prove multiple sex crimes. One purpose of the statute is to prevent mentally ill persons from being held criminally responsible for crimes committed while mentally ill." *Id.* "We therefore hold that the plural language of the statute-'acts of sexual assault or acts of sexual molestation'-refers to the defendant's future propensities, not to the demonstrated conduct." *Id.* Texas law vastly differs. Rather than to prevent mentally ill persons from being held criminally responsible for crimes committed while mentally ill, Texas makes no provision for traditional mental illness for persons such as Fisher, and facially makes them criminally responsible for violating their commitment orders. TEX. HEALTH & SAFETY CODE ANN. § 841.085 (Vernon 2000). Therefore, the statute ends with criminal punishment as we observed. Texas law begins with criminal punishment because it requisites proof of multiple sex crimes. *Id.* § 841.003. Contrary to *Hendricks*, multiple criminal convictions are the usual prerequisite for commitment. *Cf. Hendricks*, 521 U.S. at 362, 117 S.Ct. 2072, The Supreme Court concluded, "An absence of the necessary criminal responsibility suggest that the State is not seeking retribution of a past misdeed." *Id.* Conversely, logic dictates our conclusion that the presence of the necessary criminal responsibility suggests another objective manifestation that the State is seeking retribution of past misdeeds. Moreover, were the State not seeking general deterrence of future criminal acts, why pass the law at all?[17]

16. Other circumstances including those involving *nolo contendere* pleas, juveniles and persons found not guilty of sexually violent crimes by virtue of insanity are also delineated as alternative required jurisdictional basis before proceedings may be initiated under the statute.

17. If the State's true intent was to treat Fisher, why was he not offered or required to undergo treatment before his release from

■ The State argues the absence of scienter noted in *Hendricks*. *Id.* at 362, 117 S.Ct. 2072. Ordinarily, absence of scienter is evidence the statute is not intended to be retributive. *Id.* In Texas, scienter sandwiches the second prong of the statute. While the State argues that scienter is not a required finding, perhaps in the second prong of the statute, scienter would trigger its enforcement provisions. *See* Tex. Health & Safety Code Ann. § 841.085 (Vernon 2000). Furthermore, scienter is also typically required by law in order to order to establish the first prong. *Id.* § 841.003. The law states:

(a) A person is a sexually violent predator for the purposes of this chapter if the person:

(1) is a repeat sexually violent offender; and

(2) suffers from a behavioral abnormality that makes the person likely to engage in a predatory act of sexual violence.

*Id.* Typically, a repeat sexually violent offender would include a conviction of sexual assault which requires scienter. Tex. Pen. Code Ann. § 22.011. Likewise aggravated sexual assault requires scienter. *Id.* § 22.021. Notably, perhaps the more egregious indecency-with-a-child statute, requires no scienter. *Id.* § 21.11(a)(1). Whether or not the felony penalty provisions of the SVP act *require* scienter, remains to be determined. *See* Tex. Health & Safety Code Ann. § 841.085 (Vernon 2000) (person commits a felony if the person violates a requirement of the act). However, there can be little doubt that a "knowing and intentional" violation of the terms of commitment is a felony offense. *Id.*[18] We conclude the application of the first prong of the act typically requires a prior finding of scienter and, similarly, the enforcement criminal penalties clearly attach with a knowing violation of the terms of commitment.

We also believe there is merit in Fisher's argument regarding the required finding under the second prong. Specifically, the fact finder must find beyond a reasonable doubt that the person will commit an act for the purpose of victimization directed toward a stranger, casual acquaintance, or a person in a relationship established for the purpose of victimization. *Id.* § 841.002(5). An act committed for a "purpose," clearly connotes scienter.

Even assuming *arguendo*, a partial absence of this hallmark of scienter, such absence does not and cannot distinguish the Texas statute as civil. On balance, the Texas act's multiple requirements of scienter, objectively characterize the statute as punitive.

We likewise note another of the *Kennedy* factors not particularly addressed in *Hendricks*. That is the fact that the behavior to which the act applies is already a crime. *Kennedy*, 372 U.S. at 168, 83 S.Ct. 554. As we just noted, the first prong deals with past criminal activity. The second prong of the SVP act requires the likelihood of committing a predatory act of sexual violence, i.e., will commit an act for the purpose of victimization. Thus, most would perceive yet another objective manifestation of the punitive nature of the act.

---

prison? And now after his release from his incarceration and mental institution, he is not given the alternative of inpatient or other mental health treatment. Rather, under the judgment, his alternative to the 100–plus terms of commitment is a life sentence in the penitentiary.

**18.** To reiterate, no decisions as of this writing inform us whether an unintentional violation will likewise trigger this felony provision.

The *Hendricks* Court also notes that under the Kansas act, a confined individual is not subject to the more restrictive conditions placed on state prisoners, but instead experiences essentially the same conditions as any involuntarily committed patient in the state mental institution. *Hendricks*, 521 U.S. at 363, 117 S.Ct. 2072. Rather, the Texas law places 108 restraints and disabilities on Fisher. Fisher is fitted with satellite monitoring equipment by an arm of law enforcement, the Department of Public Safety. Law enforcement electronically monitors him every moment of every day. He is subject to repeated polygraph examinations. He is required to give blood and hair samples for DNA profiling. He cannot leave the state and shall not consume alcohol or controlled substances. He must notify his case manager within 48 hours of any change in health or job. He may not move his home without court approval. Other disabilities, already noted, include: any contact with family members forbidden unless approved by the case manager and staff; family members may be required to submit to criminal background checks; R-rated movies or TV programs are forbidden unless discussed with case manager and staff; Fisher must stay more than 1000 feet away and may not go to schools, swimming pools, movie theaters, public libraries, amusement parks, arcades or malls where children or potential victims are likely to be (even though he is not a pedophile); he cannot work anywhere that requires contact with women or children; Fisher may not touch anyone without their permission; Fisher may not buy, borrow, steal, possess or use cameras, recorders, CD or DVD recorders or any other recording device; he cannot use a post office box, pick up hitchhikers or stop to render aid to someone stranded on a road; and he cannot use an automobile or travel without permission. These restraints far exceed normal criminal law probation or community supervision. The general deterrent effect critically observed by Justice Kennedy is patent. *Hendricks* 521 U.S. at 372, 117 S.Ct. 2072 (Kennedy, J., concurring).

*Hendricks* observes the State may take measures to restrict the freedom of the dangerously mentally ill.[19] *Id.* Far removed from the realm of medical or psychiatric assistance, many disabilities of the Texas law exceed criminal probation or community supervision. *See* TEX. CODE CRIM. PROC. ANN., art. 42.12 (Vernon 2000). While many of the restrictions on a person found to be a sexually violent predator are identical to Texas criminal community supervision law, some are even more invasive, as noted above. Notably, a judge may extend community supervision under the penal system for ten years. *Id.* One subject to the court's indeterminate supervision under the SVP law, is exposed to a new felony term from 25 years to lifetime confinement in the state penitentiary. *See* TEX. HEALTH & SAFETY CODE ANN. § 841.085 (Vernon 2000). And the legislature unequivocally enunciated it seeks "long-term supervision and treatment." *Id.* § 841.001.

It is true the Texas law, unlike Kansas, does not at its initial implementation actually confine the person in a treatment center. However, the vast majority of effectively penal parole conditions, can hardly be said to be less restrictive or coercive than the conditions of a patient at a Texas mental institution. At most, such a person is restricted and confined for one year. *Id.* § 574.066. One-year hospital

---

**19.** Texas makes no requirement that a person be dangerously mentally ill. The focus of the act is on behavior. We discuss Texas' absence of the necessary non-volitional finding below.

confinement without superimposed felony repercussions, is sensibly limited and accompanied by procedural safeguards. This contrasts with indeterminate long-term commitment, enforced by felony imprisonment, accompanied by penal parole conditions, and additional restrictions often exceeding those imposed by the criminal law. Indeed, the elaborate structure for release from supervision and treatment, contrary to conventional mental health commitments, only requires a biannual "review." *Id.* § 841.10. The State council contracts for an expert who reports to the judge. *Id.* The judge then conducts a review at which the person is not entitled to attend, though counsel may appear. Only if the judge determines there is probable cause that the person's behavioral abnormality *has changed,* is it possible for the person to have a hearing with certain limited constitutional protections. *Id.* § 841.103.[20] The certain effect of the law is to grant review only when the executive or judicial branch of Texas government grants leave. The initial and requisite burden of proof is effectively on the committed to show the change. The State need not show the further need for commitment. Justice Burgess, in his dissent in *Beasley,* would hold these review provisions of the SVP act unconstitutional for violation of the equal protections clause. *See Beasley,* 95 S.W.3d at 615 (Burgess, J., dissenting). We doubt the Texas act meets the constitutional qualifications of *Jones. Jones,* 463 U.S. at 368, 103 S.Ct. 3043 (even a criminal acquittee

may not be held longer unless the person is both mentally ill and dangerous).[21]

Therefore, unlike Kansas, persons committed under the Texas SVP are subject to conditions often more onerous than conventional civil commitment. *See Hendricks,* 521 U.S. at 363, 117 S.Ct. 2072. As noted, the Texas indeterminate commitment is more onerous than many comparable penal provisions.

Justice Thomas, writing for the plurality, held that potentially indefinite duration is not evidence of punitive intent. *Hendricks,* 521 U.S. at 363, 117 S.Ct. 2072. He stated: "If, at any time, the confined person is adjudged 'safe to be at large,' he is statutorily entitled to immediate release." *Id.* at 363–64, 117 S.Ct. 2072. "If Kansas seeks to continue the detention beyond that year, a court must once again determine beyond a reasonable doubt that the detainee satisfies the same standards as required for the initial confinement." *Id.* at 364, 117 S.Ct. 2072. According to Justice Thomas, this requirement demonstrates that Kansas does not intend that the committed individual remain confined any longer than the period of time that the person suffers from mental abnormality. *Id.* Texas law is inapposite.

The Texas SVP law disavows its own mental health statute's one year commitment limitation, and reduces or eliminates significant other substantive and procedural safeguards. *Cf.* TEX. HEALTH & SAFETY CODE ANN. § 574.066 (Vernon 1992). Under the Texas conventional mental health statute, before a renewal of order for ex-

**20.** A case manager may also authorize the person to petition the court for release, thus by-passing judicial screening. HEALTH & SAFETY CODE ANN. § 841.121 (Vernon 2000). If the State's case manager does not authorize such a petition, the offender may file an unauthorized petition for release, subject to judicial scrutiny. *Id.* § 841.123. "The judge is not required to deny a petition [unauthorized] if

probable cause exists to believe that the petitioner's behavioral abnormality has changed ...." *Id.* (Note the language emphasizing a judge is not "required" to deny an unauthorized petition.)

**21.** This is precisely the holding in *Crane,* infra.

tended mental health services beyond one year can be entertained: (1) a county or district attorney or other adult must file an application to renew an·order for extended mental health services; (2) the application must explain in detail why the person requests renewal; (3) the application to renew an order committing the patient to extended inpatient mental health services must also explain in detail why a less restrictive setting is not appropriate; (4) the application must be accompanied by two certificates of medical examination for mental illness signed by physicians who examined the patient during the 30 days preceding the date on which the application is filed; (5) the patient, the patient's attorney, or other individual may request a hearing on the application or the court may set a hearing on its own motion; (6) a court may not renew an order unless the court finds that the patient meets the criteria for extended mental health services prescribed by Sections 574.035(a)(1), (2), and (3) and the court must make the findings prescribed by this subsection to renew an order, regardless of whether a hearing is requested or set; and (7) a renewed order authorizes treatment for not more than 12 months. *Id.*

The Texas SVP act fails the Kansas safeguards elucidated by Justice Thomas, to confine no longer than necessary. It ignores or vitiates its own laws providing for the mental health rights to retarded persons. A person thought to be mentally retarded has the right promptly to receive a determination of mental retardation using diagnostic techniques that are adapted to that person's cultural background, language, and ethnic origin to determine if the person is in need of mental retardation

services. TEX. HEALTH & SAFETY CODE ANN. § 592.018 (Vernon 2000). This was denied Fisher, and presumably all who fall under the SVP act. Each person has the right to live in the least restrictive habilitation setting and to be treated and serve in the least intrusive manner appropriate to the client's individual needs. *Id.* § 592.032 ("Each client has the right to live in the least restrictive habilitation setting and to be treated and served in the least intrusive manner appropriate to the client's individual needs."). Fisher's standard 100–plus disabilities are not tailored to his individual needs but rather represent a net cast to the broadest reach of possible variables. Thus, the Texas act fails to meet the *Kennedy* test of whether the act is excessive in relation to the alternative purpose assignable to it. *Kennedy,* 372 U.S. at 169, 83 S.Ct. 554. Unlike a conventional mental commitment not to exceed one year, the SVP trial evidence need not include either (1) expert testimony or (2) evidence of a recent overt act or a(3) continuing pattern of behavior that tends to confirm the illness. *See* TEX. HEALTH & SAFETY CODE ANN. § 574.035 (Vernon 2000). We hasten to add that although not required, the State did produce expert testimony in this particular case.[22]

There is little doubt that like Kansas, Texas assigned a non-punitive, alternative purpose, to its act. *See Hendricks,* 521 U.S. at 361, 117 S.Ct. 2072. The Legislature found that a small extremely dangerous group of sexually violent predators exists, that conventional treatment does not work and is inadequate to address the risk of "repeated predatory behavior that sexually violent predators pose to society."

---

**22.** One expert testified about the results of the Static 99 and Mn SOST–R tests. In essence, both tests heavily weigh past sexual violations, and from the past acts, future acts are hypothesized. The evidence heard by the jury thus encompasses the past convictions, and testing based on the same acts to purportedly prove behavioral abnormality and future likelihood (not probability) of recidivism.

Tex. Health & Safety Code Ann. § 841.001 (Vernon 2000). The critical issue persists, however, whether objective manifestations of purpose indicate conclusively that the provisions in question can only be interpreted as punitive. *Kennedy*, 372 U.S. at 168, 83 S.Ct. 554.

Fisher complains he is not offered the opportunity for appropriate treatment. This plea seems to be denied by *Hendricks*: "[W]e have never held that the Constitution prevents a State from civilly detaining those for whom no treatment is available, but who nevertheless pose a danger to others." *Hendricks*, 521 U.S. at 366, 117 S.Ct. 2072. "Similarly, it would be of little value to require treatment as a precondition for civil commitment of the dangerously insane when no acceptable treatment existed." *Id.* Alternatively, the Court held, the possibility that an ancillary purpose of the act was to provide treatment, and no treatment is provided, does not require a conclusion the act is punitive. *Id.* at 367, 117 S.Ct. 2072. If treatment is as irrelevant as described, should not the law require a "lack of control" element and finding? *Crane* answers the question in the affirmative.

## IV

### After *Hendricks: Crane*

■ After *Hendricks*, the United States Supreme Court markedly curtailed the application of this prior holding which we analyzed at length above. The Constitution does not permit "commitment of the type of dangerous sexual offender considered in *Hendricks* without any lack-of-con-

trol determination." *Crane*, 534 U.S. at 412, 122 S.Ct. 867. Sexual offenders subject to civil commitments must be distinguished from other dangerous persons more properly dealt with in the criminal proceedings. *Id.* "That distinction is necessary lest 'civil commitment' become a 'mechanism for retribution or general deterrence.' " *Id.* (citing *Hendricks*, 521 U.S. at 360, 117 S.Ct. 2072 (Kennedy, J., concurring)).[23] Hendricks was a pedophile who admitted lack of volitional control, coupled with a prediction of future dangerousness. *Id.* Hendricks, whose condition was listed in DSM–IV 571–572, stated he could not control the urge to molest children. *Id.* at 414, 122 S.Ct. 867 (Scalia, J., dissenting). In Justice Scalia's dissent, (joined by *Hendricks* author Justice Thomas), he notes the Kansas act, (like Texas's), contains no requirement of inability to control. *Id.* at 419, 122 S.Ct. 867. He also clearly notes the majority now establishes the requirement of a separate finding of inability to control behavior. *Id.*

We can only conclude that *Crane* amplifies the *Kennedy* factors and modifies *Hendricks*. In addition to dangerousness, the requisite mental element is inability to control behavior. *Id.* at 412, 122 S.Ct. 867. This is a required finding by the fact finder. *Id.*[24] There is no requirement of total or complete lack of control. *Id.* at 411, 122 S.Ct. 867. Hendricks demonstrated lack of control because of his serious sexual mental disorder-pedophilia-thus providing proof of inability to control behavior. *Id.* at 413, 122 S.Ct. 867. Hendricks himself testified he could not "control the urge" to molest children. *Id.* at 414, 122 S.Ct. 867.

---

**23.** It should be noted that Justice Kennedy, by concurring, provided the slim majority in the *Hendricks* plurality opinion. Justice Breyer authored the dissent in *Hendricks* and wrote for the seven-to-two majority in *Crane*.

**24.** In a Memorandum opinion, the Beaumont Court of Appeals sought to apply *Crane* in a factual sufficiency context. *See In Re Commitment of Corliss*, No. 09–02–294–CV, 2003 WL 366713, at *1, 2003 Tex.App. Lexis 1633, at *3—5 (Tex.App.—Beaumont 2003, pet. filed) (memorandum opinion).

Because neither party briefed the application of *Crane,* we do not consider whether the absence of a finding of inability to control behavior is fundamental error.[25] Rather, we apply the rationale of *Crane* as one more objective manifestation in determining whether the statute is punitive facially or as applied to Fisher. Because the Legislature has not narrowly crafted the sexually violent predator statute with the necessary "inability to control" requirement, the act is more likely designed as a mechanism for retribution or general deterrence.

## V

We note our disagreement with the plurality opinion of our sister court. The Beaumont Court of Appeals was handed the herculean task of deciding whether to enjoin the application of the SVP act. *Beasley v. Molett,* 95 S.W.3d 590 (Tex. App.-Beaumont, 2002, no pet. h.). It was faced with fourteen points of first impression.[26] We only address our disagreement with that portion of their opinion dealing with the nature of the proceeding. *Id.* at 607–08.[27]

We agree that the act imposes certain restraints similar to those imposed in community supervision (parole). *Id.* We agree that "[t]he acts that lead the person to initially qualify for the status of 'sexually violent predator' are crimes." *Id.* at 607. But we differ on the court's conclusion that there is no retribution because there is no culpability for prior criminal conduct and that the statutory scheme of treatment and supervision for the purpose of avoiding the menace of such persons is not excessive. *See id.* We believe the myriad affirmative disabilities and restraints placed on Fisher, restrictions against all touching, even his children, avoiding all venues with women or children, family criminal background checks, multiple polygraphs, satellite monitoring, and criminal felony penalties are excessive and go well beyond restraints necessary to protect the public. We have also outlined how such disabilities under the Texas act have historically been treated as punitive and how criminal scienter is required. Without further reiteration, we believe our detailed analysis readily supports our respectful disagreement with our sister court.

25. The jury below was asked whether Fisher suffered from a behavior abnormality that makes him likely to engage in predatory sexual violence. "Behavior abnormality" was defined as "a congenital or acquired condition that by affecting a person's emotional or volitional capacity predisposes the person to commit a sexually violent offence to the extent that the person becomes a menace to the health and safety of another person." We cannot discern that this question or the evidence of two 1987 sexual assault convictions equate to a mental disorder that impairs Fisher's volitional control to the degree he cannot control his dangerous *sexual behavior.* Though his schizophrenia could relate to conventional civil commitments, we do not perceive an acceptable scientific or empirical basis to equate Fisher's true unrelated mental illness with a condition that predisposes him to violent sexual offenses to the extent he cannot control his dangerous sexual behavior.

26. The second member of the majority, Chief Justice Walker, retired from the court at the end of 2002, after a long and distinguished career.

27. We specifically do not comment upon or address any of the other and sometimes interrelated issues of their opinion. Suffice it to say, our fundamental disagreement on the nature of the proceedings would affect other constitutional concerns. Our sister court also briefly addressed the "nature of the proceedings" in *In re Commitment of Mullens,* 92 S.W.3d 881, 883 (Tex.App.-Beaumont 2002, no pet. h.) and *In re Commitment of Morales,* 98 S.W.3d 288, 290 (Tex.App.-Beaumont 2003, no pet. h.). Neither of these cases address the competency issue and both follow the rationale of *Beasley.* We trust this respectful disagreement should be and will be addressed by higher authorities.

That court has more recently partially addressed some of the specific issues we discuss. *See In re Commitment of Martinez,* 98 S.W.3d 373 (Tex.App.-Beaumont 2003, no pet. h.). The case is readily distinguishable because all three experts testified Martinez was competent to stand trial. *Id.* at 375–76. By dicta, the court held, relying on *Hendricks* and its own holding in *Beasley,* that no competency hearing was required. *Id.* The court also held Martinez's claim that he could not comply with the commitment order was not ripe. *Id.* (relying upon *Patterson,* 971 S.W.2d at 443). Because evidence shows Fisher to be both mentally retarded and mentally incompetent, we do not believe *Martinez* is controlling.

## VI

Finally, we believe it helpful to further factually distinguish the *Hendricks* case from Fisher's. Fisher was convicted of two sexual assault crimes in February and August of 1987. Both convictions were based upon pleas of guilty. Fisher has served all of his time, which was extended because his probation was revoked three times for non-sexual matters-including the removal of his monitor. The two prior sexual violations were with adult women, possibly involving payment for prostitution. According to Fisher, he disagreed with the women about money. There was no proof of other sexual crimes although there was an alleged verbal threat toward a mental hospital nurse at Rusk State Hospital. There is no diagnosis of pedophilia or other recognized sexually related mental disorder. There was no allegation of involvement with children, yet Fisher was given the same restrictions as a practicing pedophile such as Hendricks. Hendricks was convicted of taking "indecent liberties" with two 13–year–old boys. Hendricks had a "chilling history" or repeated child sexual molestation including a 7–year–old girl, two young boys while working at the carnival, performing oral sex on an 8–year–old girl, and fondling an 11–year–old boy. *Hendricks,* 521 U.S. at 354, 117 S.Ct. 2072. His conduct and multiple convictions spanned the years 1955 through his release in 1994. *Id.* at 354–55, 117 S.Ct. 2072. He admitted his pedophilia, that he was not cured after professional help, and that he could not control his sexual urges toward children. *Id.* at 355, 117 S.Ct. 2072. Most importantly, *Hendricks* demonstrates the type of mental illness constitutionally necessary to impose the liberty encroachments and restrictions under a sexually violent predatory law. As a practicing pedophile, Hendricks arguably had the component lack of control sexual mental abnormality to justify commitment. *See Crane,* 534 U.S. at 412, 122 S.Ct. 867. Schizophrenia and Fisher's two remote 1987 sexual assaults, do not demonstrate the component lack of sexual control that would justify the imposition of 100–plus civil and penal restrictions of the Texas law.

We also note nine additional punitive aspects of the Texas law contrasted with the substantially greater constitutional safeguards of the Kansas statute or as observed in *Hendricks.* We list these other objective manifestations. (1) In addition to Kansas procedural safeguards allowing a confined person's immediate release at any time the person is adjudged safe to be at large, Kansas also affords (2) "all constitutional rights available to defendants at criminal trials, other than the right not to be tried while incompetent." KAN. STAT. ANN. § 59–29107 (1994).(3) Texas assigns a majority of the charging board (Multidisciplinary Team) from criminal law enforcement. The team includes two from mental health but is numerically controlled by three persons from the Texas Department of Criminal Justice, (4)

one of whom must be from the victim services office of that department; Tex. Health & Safety Code Ann. § 841.022 (Vernon 2000).(5) A "prosecutor" is selected from a special division of the prison prosecution unit, separate from the part of the unit responsible for prosecuting criminal cases. *Id.* § 841.004 (Prison Prosecution Unit). (6) No overt threat or act from the recent past is required. (7) No substantial threat or imminent risk is required. *Cf. Broussard. v. State,* 827 S.W.2d 619, 622 (Tex.App.-Corpus Christi 1992, no writ). (8) No notice is given to a prisoner or mental health patient that he or it is being evaluated for subjugation to the SVP act. (Nor is counsel provided at this juncture.) (9) The Multidisciplinary team's screening and assignment of charges to prosecutors are now secret meetings not subject to the Texas Open Meetings Act. *See* Tex. Gov. Code § 551.002 (Vernon 1994); *Beasley,* 95 S.W.3d at 599.

Finally, we note precedent very similar to Fisher's case. *Jackson* dealt with a mentally defective deaf mute with a mental level of a pre-school child. *Jackson* 406 U.S. at 717, 92 S.Ct. 1845. There the state, not unlike Texas, did not afford Jackson a substantial opportunity for early release. *Id.* at 729, 92 S.Ct. 1845. Our highest court observed that Jackson was subjected to a more lenient *commitment* standard and to a more stringent standard of *release* than those generally applicable to all others not charged with offenses. In effect, to permanently institutionalize without showing either the requirements for commitment or the opportunity for release afforded by conventional commitment, Indiana deprived the petitioner of equal protection of the laws under the Four-

teenth Amendment. *Id.* at 729–30, 92 S.Ct. 1845. In other words, Jackson was entitled to the protections of conventional commitment protection under circumstances similar to Fisher's. Because Fisher's commitment was as an outpatient, we also note there is no distinction in application of due process protection depending on whether the commitment is inpatient or outpatient. *In re D.F.R.,* 945 S.W.2d 210, 214–15 (Tex.App.-San Antonio 1997, no. pet.)

█ We sustain Fisher's first two issues regarding competency.[28] We conclude that the Texas SVP statute is manifestly punitive, both facially and as applied. Accordingly, Fisher is entitled to rights under the criminal law, specifically including the opportunity to effectively exercise his right to counsel, the right to be competent at trial, and understand and assist in the trial proceedings. Additionally, substantive due process requires he be mentally competent to comply with the order of commitment. He has the substantive right not to proceed to trial when he was incompetent. Even if the SVP statute were to be found civil or quasi-criminal, Fisher is minimally entitled to enjoy the statutorily specified opportunity to competently exercise his right to counsel. Nor do we see any overriding need of society that would refuse Fisher's right to be found sane before his proceedings.

The loss of liberty produced by involuntary commitment is more than a loss of freedom from confinement. *Vitek,* 445 U.S. at 492, 100 S.Ct. 1254. Due process requires that the nature of commitment bear some reasonable relation to the purpose for which the individual is committed. *Jones,* 463 U.S., at 368, 103 S.Ct. 3043; *Jackson,* 406 U.S. at 738, 92 S.Ct. 1845.

---

**28.** Because of our disposition of Fisher's first two issues, we need not address his remaining issues. Tex. R. App. P. 47.1

We must distinguish between sexual offenders subject to civil commitments and other dangerous persons more properly dealt with in criminal proceedings lest "civil commitments" become a "mechanism for retribution or general deterrence." *Crane* 534 U.S. at 412, 122 S.Ct. 867. Because we hold that Fisher was denied substantive and procedural due process, we reverse and remand for further proceedings consistent with this opinion.

APPENDIX 1

CAUSE NO. 00–10–06622–CV

IN RE: THE COMMITMENT
OF MICHAEL FISHER

IN THE DISTRICT COURT OF

MONTGOMERY COUNTY, TEXAS

284ᵗʰ JUDICIAL DISTRICT

***FINAL JUDGMENT AND ORDER
OF COMMITMENT***

BE IT REMEMBERED that this cause came to trial on May 29, 2001. A jury was duly selected, sworn and seated. The jury returned the verdict reflected in Exhibit "A", attached hereto. The court made certain Findings of Fact and Conclusions of Law attached hereto as Exhibit "B." Based thereon it is:

It is accordingly ORDERED, ADJUDGED and DECREED that Michael Fisher be committed to treatment and supervision by the Council on Sex Offender Treatment and/or its contractors.

It is further ORDERED, ADJUDGED and DECREED that:

1.  Michael Fisher live at a residence as approved by his case manager as long as it is not within a child safety zone which is defined by the following language in the Texas Code of Criminal Procedure, Section 13B, Article 42.12, as follows:

    (A) Michael Fisher shall not supervise or participate in any program that includes as participants or recipients persons who are 17 years of age or younger and that regularly provides athletic, civic, or cultural activities; and,

    (B) Michael Fisher shall not go in, on, or within 1000 feet of a premises where children commonly gather, including a school, day-care facility, playground, public or private youth center, public swimming pool, or video arcade facility.

2.  Michael Fisher shall follow the directives of his case manager in matters related to his residence selection and rules. Michael Fisher shall be provided with the name, work address, and telephone numbers of his case worker and treatment provider within twenty-four (24) hours of this Order.

3.  Upon release from a lock-down facility, Michael Fisher shall be fitted with satellite monitoring equipment by the Department of Public Safety. Michael Fisher shall comply with all requirements of the Department of Public Safety to insure proper functioning of the monitoring equipment.

4.  Michael Fisher shall comply with all terms and conditions of this court, his treatment provider and case manager and enter into a written agreement with his treatment provider and case manager specifying all of the terms and conditions of his treatment and case management including as are attached in Civil Commitment Requirements: Treatment and Supervision Contract (Exhibit "C").

5.  If Michael Fisher has not previously given a blood or hair sample, he shall provide appropriate blood and hair

samples to allow his inclusion in the DNA Data Bank maintained by the State of Texas.

6. Michael Fisher shall reside in the State of Texas.

7. Michael Fisher is prohibited from contacting the victims of the crimes for which he has previously been adjudicated in Cause Nos. 482193 and 461676, in the 228th District Court of Harris County, Texas whose names are Carolyn Brooks and Pamela Post–Oak (also-known as Houston).

8. Michael Fisher shall not consume alcohol or controlled substances.

9. Michael Fisher shall not change his residence without prior authorization from the court with jurisdiction and venue.

10. Michael Fisher shall not leave the State of Texas without authorization from the court with jurisdiction and venue.

11. Michael Fisher shall notify his case manager within 48 hours of any change in his status that affects proper treatment and supervision, including change in the person's physical health or job status and including any incarceration of the person.

12. This Final Judgment shall remain binding upon Michael Fisher following any release from any subsequent incarceration.

13. That Michael Fisher shall not be charged any of the cost of his treatment program or case management.

All costs are charged to the State of Texas. All relief not granted herein is DENIED.

It is further ORDERED that this cause be transferred to venue in Harris County, Texas as required by the Health and Safety Code, § 841.082(c).

SIGNED this 12th day of June, 2001.

/s/ P.K. Reiter

JUDGE PRESIDING

THE HONORABLE P.K. REITER, JUDGE

EXHIBIT "C"

## Civil Commitment Requirements: Treatment and Supervision Contract

When you participate in the Outpatient Sexually Violent Predator Treatment Program (OSVPTP), you must follow all rules of the program, Failure to comply with these rules may result in legal action. Therefore, you must carefully read this Treatment and Supervision Contract. The treatment staff or case manager can help you read and understand the contract if you want them to do so. When you sign this contract, you are showing that you have read and understand it.

**Contact with Victims**

1. I will not have contact with my victim. I will not talk to my victim. I will not telephone or write notes to my victim. I will not send messages to my victim through other people. I will not send gifts to my victim. I will not send threats or convey threats to my victim. I will not make requests of my victim.

2. If my victim attempts to contact me, directly or indirectly, I will terminate contact and report the attempted contact in writing to the Case Manager and Treatment Staff.

3. I will not pass by the place where my victim lives, plays, works or goes to school. I will not go to the homes or residences of the victim's family or friends.

4. Any contact with my victim will be arranged and approved by the Case Manager and the Treatment Staff.

## Contact with Children

5. I will not have direct or indirect contact with children unless supervised by the Case Manager and Treatment Staff or a chaperon who is approved by the Case Manager and the Treatment Staff.

6. If I am in an area where children are, I will leave the area. A child is any person younger than eighteen years old.

## Contact with Potential Victims

7. I will not have direct or indirect contact with potential victims. If I am in an area where potential victims are, I will leave the area. Any contact with potential victims will be done under the supervision of an approved chaperon or the Case Manager and Treatment Staff. A potential victim includes but is not limited to persons similar to persons whom I have already sexually exploited. The Case Manager and Treatment Staff will inform me who constitutes potential victims. I agree to use the definition of potential victim as designated by the Case Manager and Treatment Staff.

Potential Victim (specify): _____

Potential Victim (specify): _____

Potential Victim (specify): _____

Potential Victim (specify): _____

8. I will not have contact with or harass sexual assault treatment program contractors, staff, volunteers, or clients.

## Contact with Family Members

9. I will not have any contact with family members unless approved by the Case Manager and Treatment Staff. EXCEPTIONS:

Initial _____ Date _____

Initial _____ Date _____

Initial _____ Date _____

10. I understand that family members may be required to submit to a criminal background check before I can have contact with them.

11. I agree to allow and encourage family members to attend trainings conducted by the Case Manager or Treatment Staff.

12. I agree to sign a release permitting unfettered, two-way communication between family members and the Case Manager, family members and the Treatment Staff and family members and other professionals involved in my treatment.

13. I understand that I may not be allowed to have contact with family members, or contact with family members may be suspended, unless the family members have completed counseling required by the Case Manager or Treatment Staff.

## Control of Deviant Behavior

14. I will not buy, create, or possess pornography. I will not watch pornographic videos, TV programs or movies.

15. I will not watch R-rated movies or TV programs unless I discuss it with the Case Manager and Treatment Staff and receive prior written approval from both parties.

16. I will not display in my room or residence nude pictures or pictures of people who are partially clad, for example, wearing swim suits, underwear or tight and revealing clothes.

17. I will not cruise for victims. That is, I will not walk or ride around aimlessly, nor will I sit and watch people.

18. I will not go to schools, parks, swimming pools, movie theaters, public libraries, amusement parks, arcades or malls where children or potential victims are likely to be. I will not obtain work that requires contact with children or potential victims.

19. I will not use prostitutes. I will not travel through or go to places where prostitutes are located.

20. I will not make obscene telephone calls, I will not make telephone calls just to listen.

21. I will not touch people without their permission. I will not tickle or horseplay. I will not bump into people in an attempt to touch them for sexual gratification.

22. I will not engage in voyeurism of adults or children, for example, I will not look down the blouses of women or children.

23. I will not use the Internet or computers to gain access to sexual material or sexual partners. I will allow my Case Manager or his/her designee to Inspect my computer including all hardware and software. I will allow my Case Manager or his/her designee to take my computer to have it assessed by computer experts to determine if I have used my computer for sexual purposes.

24. I will not engage in exhibitionism.

### Control of Sexual Behavior

25. I will not use nonsexual objects during sexual acts, for example, shoes or belts.

26. I will not use fetishism.

27. I will not masturbate to deviant fantasies, especially to fantasies of victims or potential victims. I will stop deviant fantasies when they occur.

28. I will not use animals during sexual acts.

29. I will not use I–900 sex numbers or any form of telephone sex.

30. I will not have sexual contact with anyone who is under the age of legal consent.

31. I will not force any person to have sex with me.

32. I will not buy, possess or use sadomasochistic bindings, restraints or other paraphernalia.

33. I will not trick or bribe a person to have sex with me. I will not make a person feel guilty so that he/she will have sex with me.

34. I will not have sex with a person who is intoxicated or has been using drugs or alcohol.

35. I will not engage in casual sex, that is, sex with persons with whom I am not in a committed, monogamous relationship.

36. I will not engage in anonymous sex, that is, sex with persons I do not know and am not In a relationship with.

37. I will not have sexual contact with a person without first telling him or her that I am a Sexually Violent Predator. Before I have sexual contact with that person, I will sign a release permitting unfettered, two-way communication between the Case Manager and Treatment Staff and my potential sexual partner. I understand that the Case Manager and Treatment Staff must meet with my potential sexual partner before I have sex with that person.

### Control of High Risk Behavior

38. I will not drink alcohol or use illicit drugs.

39. I will not work in or go to bars, clubs or other places where the sale of alcohol is the primary source of business.

40. I agree to submit to random drug and alcohol screens.

41. I will not commit any new crimes.

42. I will abide by any dress code established for me by the Case Manager or Treatment Staff.

43. I will not engage in aggression or violence towards myself or others.

44. I will not join sex clubs.

45. I will not go to topless bars or adult bookstores.

46. I will not buy, borrow, steal, possess or use cameras, video recorders, audio recorders, CD recorders, DVD recorders or any other recording device.

47. I will not use fictitious names or aliases.

48. I will not use a Post Office box.

49. I will observe the schedule developed for me by the Interagency Case Management Team.

50. I will not associate with persons on probation or parole or known felons, especially other sex offenders.

51. I will not buy or possess children's or cross gender clothing.

52. I will not buy or posses costumes or masks.

53. I will not buy, posses or wear law enforcement identifications, insignias, badges, uniforms or other items associated with law enforcement.

54. I will not buy, possess or wear military uniforms, identifications, insignias or other items associated with the military.

55. If and when I am allowed to operate a motor vehicle, I will never pick up hitchhikers or stop to help persons stranded on the road.

## Travel

56. I agree to follow the Case Manager's rules regarding travel.

57. I agree to have an approved Travel Plan before leaving the county, I understand that Travel Plans may take two weeks or more before being approved by the Case Manager and Treatment Staff.

58. I agree to have a High Risk Plan before going through a high impulse area, I understand that High Risk Plans may take as much as two weeks before the Case Manager and Treatment Staff approve them.

59. I will not own, operate or use a motor vehicle without prior approval from the Case Manager and Treatment Staff.

60. If I am permitted to operate a motor vehicle, I will maintain a driving log to include the following information each time the vehicle is used: mileage, time of departure and arrival, destination, route traveled and passengers.

61. I agree never to be in a motor vehicle with a child or potential victim.

## Supervision Guidelines

62. I agree to attend all scheduled appointments with my Case Manager or his or her designee. Scheduled appointments Include office visits as well as field visits.

63. I agree to be on time for all appointments with my Case Manager or his or her designee.

64. I agree to comply with the Treatment and Supervision Contract.

65. I agree to comply with any requests or directives made by the Case Manager.

66. I agree to attain and maintain full-time employment as approved by the Interagency Case Management Team.

67. I agree to allow the Case Manager to make face-to-face contact with me at home, work or other places outside the Case Manager's office.

68. I agree to provide the Case Manager with any and all information requested regarding my family, friends, employer, and recreational and other contacts.

69. I agree to allow the Case Manager to have contact with any and all of my family, friends, coworkers, acquaintances and other persons whom I might have had or possibly could have incidental contact with.

70. I agree to actively participate in and successfully complete any and all counseling programs or sessions as directed by the Case Manager.

**Tracking Services**

71. I agree to wear an electronic monitor as directed by the Case Manager.

72. I agree to follow all requirements of the tracking services as established by the Case Manager and other professionals involved in providing tracking services.

73. I agree not to tamper with, alter, modify or manipulate any electronic monitor or associated equipment used to monitor me.

**Therapy Guidelines**

74. I will be on time for all scheduled appointments. The Treatment Staffs act as the timekeepers.

75. I will attend all scheduled sessions. Treatment Staffs will document and report whether or not I attend a scheduled session.

76. I agree to actively participate in and successfully complete the OSVPTP. Active participation includes talking constructively during therapy sessions and completing assignments. The Treatment Provider will determine if I am actively participating in treatment.

77. I will comply with the Group Rules, Program Rules, Treatment and Supervision Contract, and the Treatment Plan. I will comply with any individual rules Treatment Staffs develop for me, understand that any violation of any of these rules will result in one or more of the following: an Incident Report, a meeting with the Case Manager, suspension from therapy or termination from the OSVPTP. Treatment Staffs may use any of these responses as they see fit.

78. I will be asked to take several polygraph tests, or lie detector tests. I agree to take and pass the polygraph test when I am asked to do so. I agree to use a polygrapher recommended or approved by the Treatment Staff. I agree to attend the polygraph session only after Treatment Staffs have submitted questions to the polygrapher. I understand I may have to continue to take the polygraph test until I pass it to the satisfaction of the Treatment Staff.

79. I understand that an Incident Report will be written when I engage in any behavior that violates the Treatment Contract and Supervision Contract or Individual Rules or when I engage in behavior that the Treatment Staff deems dangerous, aggressive, threat-

ening, risky, irresponsible or troubling.

80. I understand that if I fail to make progress, I may be terminated from the program. The Treatment Staff determines whether or not I am making progress.

81. I understand I must report any violations of the Treatment and Supervision Contract at the time of my layout in a group therapy session, I understand I must discuss and correct violations.

82. I understand that I must have a written assignment ready to present to every group therapy session. I understand that partially completed work is not acceptable. I understand that I must be working on revisions of worksheets or new versions of worksheets at all times. I understand I must be prepared to present at least twenty minutes of worksheet material from my Client Handbook at every group therapy session. When not presenting my own assignments, I agree to actively listen and actively give feedback to group members who do present topics.

83. I agree to attend individual sessions as required. I understand that if I fail to schedule or attend individual sessions as required, I am in violation of the Treatment and Supervision Contract.

84. I agree to attend other types of therapy, such as Anger Management, if the Treatment Staff determines that it might help me reach my goal of **No More Victims.**

85. I understand Treatment Staffs do not provide counseling over the telephone or crisis or emergency counseling. I agree to contact providers pre-approved by the Interagency Case Man-

agement Team if I have a mental health emergency.

86. If I am seeing another counselor or mental health professional at the time of intake, or if I begin to see such a professional while in this OSVPTP. I will sign a release allowing Treatment Staffs to communicate with my counselor or mental health professional. If requested by the Treatment Staff or the Case Manager, I will cease attending therapy or receiving treatment from the other counselor or mental health professional and go to a counselor or mental health professional recommended by the Case Manager or Treatment Staff.

87. I understand the only excused absences from scheduled therapy appointments are a court appointment at the exact time of the scheduled appointment and illness. If I am ill, I understand that it means I am ill for the day. I understand that it means I don't go to work or recreational activities that day. Furthermore. I agree to go to a physician the day of my illness. I will bring a physician's note excusing me from therapy to the following session, for example, if I miss a group session, I will bring a physician's note to the next group session. I agree to call my individual therapist before the time of my appointment if I am going to miss an individual session. I agree to call both of my group therapists before to the time of the group session, if I am going to miss a group session. I will always call my Case Manager before to missing any sessions.

88. I understand that if I am discharged from group, am arrested or abscond, group therapists will discuss my absence or departure with group members so they can continue therapy.

## Absence of Confidentiality

89. I understand that there are no secrets among the Case Manager. Treatment Staff, and other professionals who are involved in my supervision or treatment. What I tell one professional will be shared with all professionals and all agencies involved in my supervision, treatment and outpatient civil commitment.

90. I understand that the Case Manager, Treatment Staff and other professionals must talk about me. I understand that these professionals will be in scheduled or unscheduled contact with each other and the courts. I understand that these professionals' communication may include but is not limited to communicating by e-mail, Internet, telephone, fax, letters, progress reports and Incident reports as a means of communication.

91. I understand that the Case Manager, Treatment Staff and other professionals can talk to law enforcement professionals, medical professionals and other relevant people about me if I try to hurt myself or someone else.

92. I understand that the Case Manager, Treatment Staff and everyone who knows me must report victims of child abuse to the state.

93. I know that visitors may come to the OSVPTP. Some visitors may observe therapy sessions. I agree to allow the Case Manager and Treatment Staff to exercise their judgment to determine who is allowed to be a visitor.

94. I understand that I am not permitted to reveal the identity of any person in the program to my family, friends or contacts.

95. I will not have contact with group members other than in therapeutic or supervision sessions conducted by the Case Manager or Treatment Staff.

96. I understand information about me is kept in a database for the purpose of outcome evaluation studies. I understand all information about me is kept confidential and if the results of evaluation studies are released, there will be no identifying information and my identity will not be revealed.

97. I understand that my therapy or supervision sessions may be video or audio taped. I agree to allow the Case Manager or Treatment Staff to video or audio record my therapy or training sessions.

If I have any questions about the contract, I know that I can ask the Case Manager or Treatment Provider. When I sign this contract, it means that I understand and agree to it. A photocopy of this contract is as valid as the original.

_____  _____
Client's Signature              Date

_____  _____
Treatment Provider           Date

_____  _____
Case Manager                  Date

* The treatment staff will forward a copy of this contract to the case manager. The original will be retained by the treatment staff.

CASTILLO, Justice, dissenting.

Assuming without deciding that appellant presented his specific constitutional challenges to the trial court and thus preserved error, I respectfully dissent for the reasons stated by the Austin court of appeals in *In re Browning*, 113 S.W.3d 851, 858–59 (Tex.App.-Austin 2003, no pet. h.) and the Beaumont court of appeals in *In re Martinez*, 98 S.W.3d 373, 375–76 (Tex. App.-Beaumont 2003, no pet.) (per curiam)

and *Beasley v. Molett,* 95 S.W.3d 590, 607–08 (Tex.App.-Beaumont 2002, pet. filed).